IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OXBOW CARBON & MINERALS HOLDINGS, INC., INGRAHAM INVESTMENTS LLC, OXBOW CARBON INVESTMENT COMPANY LLC, WILLIAM I. KOCH, and OXBOW CARBON LLC, | § § § § § § | No. 536, 2018 |
| | § | |
| Plaintiffs and Counterclaim Defendants-Below, Appellants, | § § § § | Court below: Court of Chancery of the State of Delaware |
| | § | |
| v. | § § | C.A. Nos. 12447-VCL 12509-VCL |
| | § | |
| CRESTVIEW-OXBOW ACQUISITION, LLC, CRESTVIEW-OXBOW (ERISA) ACQUISITION, LLC, CRESTVIEW PARTNERS, L.P., CRESTVIEW PARTNERS GP, L.P., CRESTVIEW ADVISORS, L.L.C., and LOAD LINE CAPITAL LLC, | § § § § § § § § | |
| | § | |
| Defendants and Counterclaim Plaintiffs-Below, Appellees. | § § § | |

Submitted: December 19, 2018
Decided: January 17, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ** and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED** in part and **REVERSED** in part.

Stephen C. Norman, Esquire, Jaclyn C. Levy, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware. Of Counsel: David B. Hennes, Esquire (*argued*), C. Thomas Brown, Esquire, Adam M. Harris, Esquire, Elizabeth D. Johnston, Esquire, Ropes & Gray LLP, New York, New York for Appellants *Oxbow Carbon & Minerals Holdings, Inc., Ingraham Investments LLC, William I. Koch and Oxbow Carbon Investment Company LLC.*

Kenneth J. Nachbar, Esquire, Thomas W. Briggs, Jr., Esquire, Richard Li, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Of Counsel: R. Robert Popeo, Esquire, Michael S. Gardener, Esquire, Breton Leone-Quick, Esquire, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, Massachusetts for Appellants *Oxbow Carbon LLC*.

Kevin G. Abrams, Esquire, Michael A. Barlow, Esquire, April M. Kirby, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware; Brock E. Czeschin, Esquire, Matthew D. Perri, Esquire, Sarah A. Galetta, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware. Of Counsel: Michael B. Carlinsky, Esquire (*argued*), Chad Johnson, Esquire, Jennifer Barrett, Esquire, Silpa Maruri, Esquire, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York; Christopher Landau, P.C., Quinn Emanuel Urquhart & Sullivan, LLP, Washington, D.C. for Appellees *Crestview-Oxbow Acquisition, LLC and Crestview-Oxbow (ERISA) Acquisition, LLC*.

J. Clayton Athey, Esquire, John G. Day, Esquire, Prickett, Jones & Elliott, P.A., Wilmington, Delaware. Of Counsel: Dale C. Christensen, Jr., Esquire, Michael B. Weitman, Esquire, Seward & Kissel, LLP, New York, New York for Appellee *Load Line Capital LLC*.

**VALIHURA**, Justice:

Two of Oxbow Carbon LLC's ("Oxbow") minority Members—Crestview Partners, L.P. and Load Line Capital LLC (together, the "Minority Members")—have attempted to force a sale of Oxbow over the objection of Oxbow's majority Members, William I. Koch and his affiliates (the "Koch Parties").[1] This dispute centers on the proper interpretation of the governing Third Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"). Although the Court of Chancery found that the minority investors affiliated with Koch—Ingraham Investments LLC and Oxbow Carbon Investment Company LLC (collectively, the "Small Holders")—could block the sale unless it met certain payment conditions, the court nonetheless found a contractual gap in the LLC Agreement because the Board did not specify the terms and conditions under which the Small Holders acquired their units. Using the implied covenant of good faith and fair dealing, the Court of Chancery filled that gap by implying a "Top-Off" option for the Small Holders' units, effectively stripping them of the right to block the proposed transaction.

On appeal, Oxbow claims that (1) the trial court improperly applied the implied covenant, (2) there was no contractual gap, (3) Oxbow did not breach the LLC Agreement, and (4) the court's rulings on remedies are erroneous. We hold that the Court of Chancery correctly interpreted the LLC Agreement's plain language, but erred by finding a contractual gap concerning the admission of the Small Holders. Thus, we AFFIRM in part and REVERSE in part the Court of Chancery's February 12, 2018, decision, and VACATE the August 1, 2018, decision on remedies.

---

[1] The Koch Parties consist of Oxbow, Oxbow Carbon & Minerals Holdings, Inc., William I. Koch, Oxbow Carbon Investment Company LLC, and Ingraham Investments LLC.

## I.    *Background Facts*[2]

Oxbow, the leading third-party provider of marketing and logistics services to the global petcoke market, is a Delaware LLC controlled by William I. Koch through Oxbow Carbon & Minerals Holdings, Inc. ("Oxbow Holdings").[3]  Koch serves as Oxbow's CEO and Chairman of the Board.  To finance two possible acquisitions in 2006, Oxbow explored investment by outside private equity firms.  Crestview, a new firm led by Robert J. Hurst and Barry S. Volpert, expressed interest in investing in Oxbow.  Hurst and Volpert had a combined fifty years of experience at Goldman Sachs, where both held high-level posts.[4]  During the capital-raising process, Oxbow also explored possible investments by ArcLight Capital Partners LLC ("ArcLight")[5] and by John Coumantaros, a wealthy shipping magnate.

The LLC Agreement was executed on May 8, 2007.[6]  Oxbow Holdings made the largest capital contribution of $483,038,499.86 in return for 4,830,385 units—almost 60% of Oxbow's equity—and the right to appoint six Board members.  Several of Koch's family

---

[2] We rely primarily on the Court of Chancery's factual findings, most of which are not at issue in this appeal.  Any disputed facts are noted in this Opinion.

[3] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *4–5 (Del. Ch. Feb. 12, 2018) [hereinafter *Chancery Opinion*].

[4] Hurst had served as Goldman's co-head of investment banking and as Vice Chairman, while Volpert had served as the co-Chief Operating Officer of Goldman's private equity business.

[5] ArcLight did not participate in the investment because it was not willing to accept some of Koch's governance demands.

[6] The signatories to the LLC Agreement were: Oxbow Holdings; Crestview-Oxbow Acquisition, LLC; Crestview-Oxbow (ERISA) Acquisition, LLC; Load Line Capital LLC; Joan E. Granlund; Wyatt I. Koch 2000 Trust; and William I. Koch Family Trust.  *See* App. to Opening Br. at A2124–28.  Koch also agreed that he and his Affiliates would be bound by the terms of Article IV, Section 8 (entitled, "Non-compete") of the LLC Agreement.  *Id.* at A2129.

4

members and affiliates also invested, which meant that Koch and his affiliates owned a combined 67% of Oxbow's equity. Crestview made a capital contribution of $190 million and received nearly 1.9 million units—a 23.48% equity stake—and appointed Hurst and Volpert to the Oxbow Board. Coumantaros made a capital contribution of $75 million through Load Line Capital LLC ("Load Line") in return for 750,000 units, representing 9.27% of Oxbow's equity. Load Line was entitled to one Board appointment and appointed Coumantaros to Oxbow's Board. Additionally, the Minority Members received a put option that could be exercised after seven years, beginning May 8, 2014 (the "Put Right"). If Oxbow rejected the put, the party exercising the Put Right could attempt to force an "Exit Sale" of all of Oxbow's units.

In the fall of 2010, Oxbow pursued an acquisition of International Commodities Export Corporation, a large sulfur-trading business. As a part of the acquisition, Oxbow allowed the sulfur company executives to purchase equity in Oxbow. Around the same time, Koch proposed to the Board that members of his family have an opportunity to simultaneously invest in Oxbow with the sulfur company executives. On April 28, 2011, the Board—including the Minority Members' representatives—voted unanimously to issue units to Koch's family members and the sulfur company executives at $300 per unit. Koch's family members invested through Ingraham Investments LLC ("Family LLC"), and the sulfur company executives invested through Oxbow Carbon Investment Company LLC ("Executive LLC"). Koch has controlled Family LLC from its inception, and he is the sole manager of Executive LLC's managing member.

5

The Board did not immediately implement the transactions, however, as there were other details to sort out with the sulfur company executives. During that time, Oxbow's then-CFO, Zach Shipley, alerted Koch and Oxbow's corporate secretary to certain procedural requirements in the LLC Agreement that the Board did not follow in its April 28, 2011, vote. In an email, Shipley wrote:

> In the context of [Oxbow] selling new equity to members of Bill's family, it has been drawn to my attention that the Operating Agreement of [Oxbow] gives all members certain rights of participation in any equity [issuance] by the Company . . . . I don't think this will have a practical effect on the ultimate outcome of the equity sales to Bill's family, but it does present a procedural requirement. Basically, we have to offer equity to all members at $300 per unit . . . . I expect that, at $300/unit, no one but the intended buyers will buy additional equity, but if they do, maybe that is a good thing.
>
> [T]his does raise a question about whether we need to get a slightly different approval from the Board.[7]

The issuance of units to Koch's family members also implicated Article III, Section 3(d)(11) of the LLC Agreement (the "Related Party Provision"), which triggers the need for a "Supermajority Vote," defined as approval from a majority of the Board, which approval had to include the Load Line director and at least one Crestview director. Oxbow did not get any additional approvals from the Board for the issuance to Koch's family members. Further, the court found that the Small Holders did not provide Oxbow with the required signature pages and representations and warranties until 2016.

The Board reevaluated its earlier approval of the issuance of new units to Executive LLC on November 9, 2011, and raised the total number of units to be issued without

---

[7] *Chancery Opinion*, 2018 WL 818760, at *18.

changing the price. But the Board failed to address the issue of preemptive rights or otherwise comply with the requirements for admitting new Members.[8] Nevertheless, Oxbow issued 66,667 units to Family LLC for $20 million on December 23, 2011, and issued 50,000 units to Executive LLC on March 12, 2012, for $15 million. Following those investments, the Small Holders owned a combined 1.4% of Oxbow's equity. And as with the Board vote in April 2011, the Minority Members' Board representatives consented in 2012 to the distribution of funds from the Small Holders' investment.[9] Crestview believed it was giving the Small Holders "a great discount," and Crestview received about $8.2 million from these 2012 distributions.[10]

As Crestview explored an exit from Oxbow around the time the Small Holders were admitted, Morgan Stanley was advising Oxbow and Crestview that Oxbow's units could be publicly offered at around $400 per unit and that the stock would trade up to around $500 per unit. The LLC Agreement provided Crestview with an option to exit Oxbow via the Put Right beginning on May 8, 2014, the seventh anniversary of the effective date of its investment. Alternatively, if the put failed, Crestview could force an Exit Sale of all

---

[8] The Koch Parties argue that the trial court erred in finding that the Supermajority Vote requirement had not been followed since the directors unanimously voted in favor of the issuances to the Small Holders. Opening Br. at 51. In their Answering Brief, the Minority Members seem to tacitly agree in responding that "the trial court concluded only that a Supermajority Vote was required and, had proper formalities been followed, the '[Minority Members] could have blocked the issuance and forced a negotiation.'" Answering Br. at 36–37 n.10 (quoting *Chancery Opinion*, 2018 WL 818760, at *62). Additionally, the Koch Parties claim that the trial court erred in overlooking the fact that Family LLC executed the required joinder in 2011. *See* Reply Br. at 23 n.61; App. to Opening Br. at A1911. Even if the trial court erred in that regard, it does not alter our decision.

[9] *See* App. to Opening Br. at A1913, A1915–16.

[10] *Chancery Opinion*, 2018 WL 818760, at *19.

7

Oxbow's units under certain conditions. One of those conditions is that a Member cannot be forced to sell its units in the Exit Sale unless the Member has received distributions equal to or higher than 1.5 times the Member's initial contribution (the "1.5x Clause"). By the time Oxbow admitted the Small Holders, the other Members had received returns sufficient to meet the 1.5x Clause. The Small Holders, however, required a return of $414 per unit, taking into account distributions that had already been paid to them, to satisfy the 1.5x Clause at the time of an Exit Sale. The Court of Chancery found that "[t]here is some reason to think that Crestview's principals were not overly concerned with the issuances to the Small Holders because of the valuation that they placed on Oxbow," which they projected "at close to $560 per unit" for a potential exit in 2015.[11]

By 2013, Koch had become concerned that Crestview was focused on achieving liquidity for its investment. In response to this concern, Crestview agreed to postpone the date by which it could exercise its Put Right for Oxbow to buy its units, or, in the event Oxbow rejected the Put Right, its right to force an Exit Sale. Crestview and Oxbow amended the LLC Agreement to incorporate this postponement, which they repeated three times before litigation commenced.[12] In February 2014, with the Minority Members' seven-year holding period coming to an end, the parties negotiated Amendment No. 3. The amendment, negotiated after the Small Holders invested, addressed the Exit Sale Right. Notably, the Minority Members did not bargain for a change to the "all, but not less than

---

[11] *Id.*

[12] *See* App. to Opening Br. at A2057 (Amendment No. 3), A2055 (Amendment No. 4), A2053 (Amendment No. 5), A2049 (Amendment No. 6).

all"[13] language in the definition of "Exit Sale," even though the parties removed that limitation for the Minority Members' Put Right.[14]

With an Exit Sale looming, Oxbow searched for replacement capital to redeem Crestview's units. During that process, Christina O'Donnell became a key player. O'Donnell had begun working with Koch as a consultant to his family office, Renegade Management, Inc., where she performed well and gained Koch's trust. In 2014, Koch elevated O'Donnell to become a member of Oxbow's Board and CEO of Renegade Management. She also served as the president of Family LLC and Vice President of Oxbow Holdings. These positions gave O'Donnell significant oversight responsibility of Koch's financial holdings.

In the midst of a "management crisis" in December 2014 and early 2015, however, O'Donnell developed close relationships with Eric Johnson, Oxbow's President, and Volpert and Hurst. Johnson was at odds with Koch and felt indebted to Crestview following his promotion to President of Oxbow. Eventually, O'Donnell, Johnson, Volpert, and Hurst concluded that Koch should step down from Oxbow's leadership. They evaluated several options, including purchasing enough of Koch's units to acquire control,

---

[13] This clause, known as the All Securities Clause, is discussed in greater detail at pp. 19–20, 25–27, *infra*.

[14] *See In re Oxbow Carbon LLC, Unitholder Litig.*, C.A. No. 12447-VCL, at ¶ 23(c) (Del. Ch. Aug. 10, 2016) [hereinafter *Summary Judgment Order*]; App. to Opening Br. at A2057–59. As the trial court found, the Third Amendment modified the Exit Sale Right by eliminating Crestview's right to exercise it if Crestview owned less than ten percent of the Company. Thus, when Crestview owned ten percent or more of the Company, the Third Amendment did not change the Exit Sale Right. Other amendments shortened the amount of time that the Company had to respond to the put, but the substance of the Exit Sale Right remained the same.

empowering Johnson to run Oxbow, or bringing in an outside investor to purchase enough of Koch's units to give Crestview and the new investor a majority stake. When they attempted to convince Koch to take a leave of absence to address personal matters, Koch viewed their suggestion as an attempt to undermine his control.

Amid the heightening tension between Oxbow and Crestview, Koch instructed O'Donnell to run the capital-raising process necessary to purchase some or all of Crestview's units. Koch also informed O'Donnell that he did not want Crestview involved in that process. O'Donnell disregarded that instruction and continued working with Crestview to find outside investors in an effort to remove Koch. O'Donnell and Crestview communicated secretly, using private email accounts, texts, and phone calls. They also reported to potential investors that Koch would transition the CEO role to Johnson and sell enough equity to give up control of Oxbow—even though Koch had committed to do neither. As a result of their efforts, Oxbow received proposed term sheets from ArcLight, Energy Capital Partners, and Trilantic Capital Partners.

Koch disliked the proposed term sheets because he thought they threatened his control of Oxbow. At O'Donnell's suggestion, Koch sought legal counsel and hired Mintz, Levin, Cohen, Ferris, Glovsky & Popeo, P.C. ("Mintz Levin") to advise him personally. Koch conferred with Mintz Levin and confirmed that the proposed term sheets would be disastrous for his control over Oxbow. Meanwhile, O'Donnell and Crestview attempted to promote a transaction with one of the three private equity firms, which would result in Koch giving up control in favor of Johnson. Koch and Mintz Levin concluded from these efforts "that O'Donnell, Johnson, and Crestview were trying to use the capital raise to stage

10

a coup."[15] Despite his feeling that O'Donnell had betrayed him, Koch opted to keep her at Oxbow.

Koch proceeded to take control of the capital-raising process, and, in June 2015, he informed the Board that Crestview's interests were at odds with Oxbow's interests. He further informed O'Donnell and Johnson that they could no longer be involved in the process. Crestview exercised its Put Right on September 28, 2015, and demanded that Oxbow purchase all of its units.[16] Oxbow had until January 19, 2016, to accept the put and acquire the Minority Members' units. If it did not, Crestview could attempt to force an Exit Sale. Per the LLC Agreement, Oxbow Holdings sought to hire an investment banker and eventually retained Evercore Group L.L.C. ("Evercore") to conduct a valuation of Oxbow. If Evercore's valuation was within ten percent of the figure calculated by Crestview's investment banker, Duff & Phelps, LLC, the fair market value for purposes of the Put Right would be the average of the two. Otherwise, the parties would retain a third investment bank and the median of the three valuations would control.

Meanwhile, Oxbow retained Goldman Sachs in October 2015 to raise capital capable of satisfying the put. None of the offers solicited by Goldman exceeded $120 per unit for a minority stake. The trial court found some evidence that the offers could have been low because of Crestview's attempt to influence this process. For example, Crestview continued back-channel discussions with Goldman and considered rolling some of its stake

---

[15] *Chancery Opinion*, 2018 WL 818760, at *29.

[16] Additionally, Load Line exercised its right to tag-along with Crestview's exercise of the Put Right.

11

into a control deal with the bidder.[17] O'Donnell and Johnson continued to secretly communicate with Crestview and held private meetings with possible bidders, including Trilantic and ArcLight.

During the valuation and bidding process, legal counsel for Koch and Oxbow explored ways to handle the put. Aside from Oxbow's preferred option—raising capital to accept the put, thereby nixing any Exit Sale—the attorneys for Koch and Oxbow proposed three options: (1) negotiate a reduced redemption amount with the Minority Members; (2) reject or ignore the put and permit Crestview to exercise its right to an Exit Sale, but then dispute the validity of the Exit Sale because the Small Holders did not satisfy the 1.5x Clause; or (3) accept the put and take the position that Oxbow only had the ability to redeem units periodically over time. Koch's advisors also proposed going public or merging with a public shell company, which would eliminate the Minority Members' ability to exercise the Put Right. However, Evercore advised that there was no time to conduct an IPO.

In November 2015, Evercore submitted its fair market valuation of Oxbow at $145 per unit—far lower than the Minority Members' valuation of $256.56. Because the

---

[17] *Chancery Opinion*, 2018 WL 818760, at *34. In a post-oral-argument skirmish to correct their counsel's response to a question on the "roll-over" point, the Minority Members asserted that this "roll-over" option would have been available to all existing investors. *See* Minority Members' Mot. to Correct the Record Concerning a Mistaken Statement Made at Oral Argument, at 2. They further asserted that the final ArcLight proposal lacked a provision allowing any unitholder to roll-over its equity. *Id.* at 3. The Koch Parties countered by pointing to the trial court's findings that "Crestview perceived that if an Exit Sale took place, it might be able to roll over part of its interest or co-invest with the buyer," and that "[t]his would allow Crestview to continue to own what it regarded as a highly profitable business, but without the headaches of dealing with Koch." *Chancery Opinion*, 2018 WL 818760, at *34. The Minority Members responded that these findings referred to an earlier time period. We have considered these submissions and neither they nor the "roll-over" points in general have any impact on our holding.

valuations differed by more than ten percent, the parties hired Moelis & Company, which advised that the fair market value of Oxbow was $169 per unit. As the median of the three valuations, this figure set the fair market value for the Put Right. The directors appointed by Oxbow Holdings unanimously rejected the put on January 19, 2016, and Koch instructed Oxbow and its counsel to "obstruct [and] derail" the Exit Sale.[18]

Crestview exercised its right to an Exit Sale on January 20, 2016. To kick off the Exit Sale process, Oxbow began looking for an investment bank to conduct the sale. Crestview had a strong preference for Goldman Sachs and, behind the scenes, Hurst, Volpert, Johnson, and O'Donnell discussed how to convince Koch to hire Goldman. O'Donnell, who now had been sidelined by Koch, emailed Johnson, saying:

> Let's take [Koch's] company from him quickly, not a day of relief, put him through the hell he put us through, let's find $30 million of cost savings if he's not running it. Let's make it very personal, just like he did.

> Let's remind him we know things about him as well. Let's take his plane, his job, and when it's over let's drink his wine before you take me dancing.[19]

Oxbow eventually hired Goldman Sachs, but Johnson and O'Donnell suggested that Crestview adopt "the ambush approach" and act as though they had little interest in selling, and then once Oxbow hired Goldman, they would "sell hard."[20] On March 16, 2016,

---

[18] *Chancery Opinion*, 2018 WL 818760, at *35. The Crestview and Load Line directors did not participate in the vote. *See* Trial JX2068, JX2076.

[19] App. to Opening Br. at A2006.

[20] *Chancery Opinion*, 2018 WL 818760, at *37.

ArcLight sent Oxbow, Crestview, and Load Line a letter of intent to acquire one-hundred percent of Oxbow's equity for $176.59 per unit.

On June 10, 2016, the Koch Parties filed suit against the Minority Members, Hurst, and Volpert, primarily seeking a declaratory judgment that its interpretation of the LLC Agreement was correct and that the Small Holders could block the Exit Sale. After Koch initiated this litigation and fired Johnson, ArcLight dropped out, not wanting to buy into a pending lawsuit. When the Minority Members asserted counterclaims and sought a declaratory judgment to enforce their interpretation of the LLC Agreement, the Koch Parties filed a separate 144-page complaint against Crestview, Volpert, Hurst, O'Donnell, and Johnson, asserting additional claims of contractual and fiduciary breaches. The Court of Chancery consolidated the actions and the parties cross-moved for summary judgment.

In its summary judgment opinion, the Court of Chancery suggested that the Minority Members essentially made a "fairly litigable" implied covenant argument:

> The Minority Members stress that the 1.5x Return Clause would be satisfied except for the Small Holders. They argue with some force that given the overall structure of the agreement and the concept of the Exit Sale, they never would have agreed that investors with a stake as small as the Small Holders' would be able to block the operation of the Exit Sale Right. That is an implied covenant argument, and it is fairly litigable. One can posit that in the original bargaining position, had the current situation been discussed, then the Minority Members would have insisted on the ability to compensate the Small Holders separately, rather than lose the efficacy of the threat that put teeth into the Put Right. It is also true that the Company, [Oxbow Holdings], and Koch did not historically act as if the Small Holders were an impediment to the Exit Sale Right. But the current cross-motions for summary judgment are not about the implied covenant. They are about the plain language of the Exit Sale Right, which is contrary to the Minority Members' position.[21]

---

[21] *Summary Judgment Order*, C.A. No. 12447-VCL, at ¶ 23(b).

Although it had raised the implied covenant *sua sponte*, the court held in its summary judgment order that the "Highest Amount Interpretation" controlled. Under the Highest Amount Interpretation, to initiate an Exit Sale, each Oxbow Member must participate and receive 1.5 times its initial investment by *pro rata* distribution, resulting in equal consideration for each Member. The trial court rejected Crestview's primary interpretation—the "Leave Behind Theory"—which would allow Crestview to force an Exit Sale of all Members who met the 1.5x Clause through *pro rata* distribution of Exit Sale proceeds, while leaving behind Members who did not satisfy the 1.5x Clause.

Heeding the court's suggestion, the Minority Members amended their counterclaims and added a count for breach of the implied covenant of good faith and fair dealing. In their pre-trial briefing, the Minority Members argued that a contractual gap exists because: (1) the LLC Agreement does not expressly permit or prohibit a Top-Off (the "Top-Off Gap"),[22] and (2) the Board had not determined the rights of the Small Holders (the "Small Holders' Rights Gap"). The Minority Members argued that the Top-Off Gap should be filled with a Top-Off payment, but they did not request a specific remedy as to the Small Holders' Rights Gap. In their post-trial briefing, the Minority Members abandoned the

---

[22] The Vice Chancellor's February 12, 2018, opinion uses the term "Top Off" to refer to both a "Seller" and "Waterfall" Top-Off. Under a Seller Top-Off, "Crestview, Load Line, or the buyer in an Exit Sale would come up with greater consideration for the Small Holders." *Chancery Opinion*, 2018 WL 818760, at *54. A Waterfall Top-Off is another version of a top-off theory "in which the proceeds of an Exit Sale are allocated first to members who have not yet received enough distributions to satisfy the 1.5x Clause, then subsequently allocated *pro rata* to all members." *Id.* We adopt the same approach in this opinion.

15

Small Holders' Rights Gap Theory, argued only the Top-Off Gap Theory, and claimed that the gap should be filled with a Top-Off payment.

The parties proceeded through discovery and to trial in July 2017. The Court of Chancery held that the Highest Amount Interpretation was the only reasonable reading of the LLC Agreement based on its plain language, but it ruled in favor of the Minority Members on the basis of the Small Holders' Rights Gap implied covenant theory. As explained more fully below, the trial court found a contractual "gap" concerning the Small Holders' admission. After finding a gap, the court used the implied covenant to allow the Minority Members to satisfy the Small Holders' 1.5x threshold using a Seller Top-Off, thereby allowing for an Exit Sale. On October 10, 2018, the Koch Parties appealed to this Court and the parties submitted a Joint Motion for Expedited Proceedings, which this Court granted on October 25, 2018.

## II.    Key Terms of the LLC Agreement

The terms central to this dispute concern the admission of the Small Holders and the provisions impacting the Exit Sale process. Under Article IV, Section 5 of the LLC Agreement, Oxbow's Board possesses the power to admit new Members (the "New Member Provision"). That section provides:

> Section 5.    Additional Members. Subject to Article XIII, Section 5, upon the approval of the Directors, additional Persons may be admitted to the Company as Members and Units may be created and issued to such Persons as determined by the Directors *on such terms and conditions as the Directors may determine at the time of admission*. The terms of admission *may provide for the creation of different classes or series of Units having different rights, powers and duties*. As a condition to being admitted as a Member of the Company, any Person must agree to be bound by the terms of this Agreement by executing and delivering a counterpart signature page to this Agreement,

and make the representations and warranties set forth in Section 7 below as of the date of such Person's admission to the Company. The address, Percentage Interest and Capital Contribution of each such additional Member shall be added to Exhibit A, which shall thereby be amended.[23]

The LLC Agreement defines "Member" in Article I:

"*Member*" or "*Members*" means any Person named as a member of the Company on Exhibit A attached hereto and *includes any Person subsequently admitted as a Member*.[24]

The admission of additional Members requires certain formalities. Article XIII, Section 5(a) of the LLC Agreement (the "Preemptive Rights Provision") states: "Subject to the terms and conditions of this Section 5, each Member will have the right to purchase its '*pro rata* share' of any Equity Securities (as defined below) that the Company may, from time to time, propose to issue and sell after the Effective Date. . . ."[25] The remainder of Section 5 contains additional procedural requirements regarding the issuance of new equity securities. Most notably, Section 5(b) requires written notice concerning new equity issuances:

(b) *Exercise of Rights*. If the Company proposes to issue Equity Securities, the Company will give each Member written notice of its intention, describing the Equity Securities and the price and terms and conditions upon which such Equity Securities are to be issued and/or sold. Such Member will have 20 calendar days from its receipt of such notice to elect to purchase up to its *pro rata* share of the Equity Securities for the price and upon the terms and conditions specified in the notice by providing written notice to the Company which include the quantity of Equity Securities to be purchased. Notwithstanding the foregoing, the Company will not be required to offer or

---

[23] App. to Opening Br. at A2093 (emphasis added).

[24] *Id.* at A2080 (emphasis added). Pursuant to Article IV, Section 1 of the LLC Agreement, Member interests in the Company are represented by "Units," which is also a defined term.

[25] *Id.* at A2110.

sell such Equity Securities to such Member if such action would result in any of the consequences set forth in Article XIII, Section 2(a)–(e).[26]

Additionally, certain related-party transactions are prohibited absent supermajority approval by the Board under the Related Party Provision:

> (d)    Except as contemplated in an Approved Summary Annual Budget, the Company shall not take, and shall cause its Subsidiaries not to take, any of the following actions without a Supermajority Vote (provided, that the consent of the Crestview Directors (only one of which shall be required to consent) and the Load Line Director shall not be unreasonably withheld, delayed or conditioned in any event):
>
> . . .
>
> > (11)    the Company's or any Subsidiary's entering into, terminating or amending any transaction, agreement or arrangement with or for the benefit of any Member or any of its Affiliates (or any member of their "immediate family" as such term is defined in Rule 16a-1 of the Securities Exchange Act of 1934) . . . .[27]

Article XIII, Section 8(a) of the LLC Agreement contains the Minority Members' Put Right:

> (a)   Subject to the terms herein, and provided that the Company (or its successor) is not Publicly Traded, Crestview shall possess the right and option (the "Put Right"), exercisable in its sole discretion, to require the Company to purchase in cash for Fair Market Value (the "Put Price") all or any portion of the Member Interest and Units then held by Crestview, but in no case less than twenty-five percent (25%) of the Member Interest and Units held by Crestview prior to the first such exercise of its Put Right. . . .  In the event Crestview does not exercise its Put Right within sixty (60) calendar days following an event described in the foregoing clauses (ii) or (iii), Load

---

[26] *Id.* at A2111.

[27] *Id.* at A2087, A2089.  The Vice Chancellor found that the Related Party Provision applied to the issuance of units to the Small Holders because Koch controlled both entities and is related to investors in Family LLC. *See Chancery Opinion*, 2018 WL 818760, at *62.

18

Line shall possess the Put Right, subject to the same limitations described herein (including the foregoing proviso). . . .[28]

Amended Section 8(e) of Article XIII (the "Exit Sale Right") sets forth the rights of the Minority Members in the event that Oxbow rejects the put:

> (e)  If (x) the Company rejects the Put Notice in writing or fails to respond to the Put Notice within 180 calendar days of its receipt and (y) the Company is not Publicly Traded:
>
> > (A) if at such time Crestview owns ten percent (10%) or more of the outstanding Member Interests and Units of the Company, *the Exercising Put Party may require all of the Members to engage in an Exit Sale, on the terms set forth in Section 7(c), Section 7(d) and Section 9(b)*, in which the aggregate consideration to be received by such Members at the closing of such Exit Sale equal or exceed Fair Market Value; *provided, that the Exercising Put Party may not require any other Member to engage in such Exit Sale unless the resulting proceeds to such Member (when combined with all prior distributions to such Member) equal at least 1.5 times such Member's aggregate Capital Contributions through such date* . . . .[29]

The definition of an "Exit Sale" is essential to the interpretation of the Exit Sale Right.

Article I of the LLC Agreement defines an Exit Sale as:

> [A] Transfer of *all, but not less than all*, of the then-outstanding Equity Securities of the Company and/or all of the assets of the Company to any non-Affiliated Person(s) in a bona fide arms'-length transaction or series of related transactions (including by way of a purchase agreement, tender offer, merger or other business combination transaction or otherwise).[30]

---

[28] App. to Opening Br. at A2057–58.

[29] *Id.* at A2058 (emphasis added).

[30] *Id.* at A2079 (emphasis added).

A transfer requires "all, but not less than all" Equity Securities (the "All Securities Clause"). Thus, for an Exit Sale to take place at the unitholder level, the All Securities Clause means that no Member can be left behind.

Upon the exercise of the Exit Sale Right, the parties had an obligation to use "reasonable efforts" to effectuate the Exit Sale under Article XIII, Section 8(f) (the "Reasonable Efforts Provision"):

> (f) If the Exercising Put Party elects to require all of the Members to engage in an Exit Sale pursuant to Section 8(e) above . . . *each party hereto agrees to use its reasonable efforts to take or cause to be taken or do or cause to be done all things necessary or desirable to effect such Exit Sale*. Without limiting the generality of the foregoing, each Member shall vote for, consent to and raise no objections against any Exit Sale pursuant to this Section 8(f) and shall enter into customary definitive agreements in connection therewith.[31]

As stated in the Exit Sale Right, any Exit Sale must take place "on the terms set forth in [Article XIII,] Section 7(c), Section 7(d) and Section 9(b)" (collectively, the "Equal Treatment Requirements"). Section 7(c) provides for a *pro rata* allocation of expenses for an Exit Sale:

> (c) In the case of both a Tag-Along Transfer and an Exit Sale, each Member shall be obligated to pay only its *pro rata* share (based on the aggregate consideration received by such Member in respect of the Units Transferred by such Member) of expenses incurred in connection with a consummated Tag-Along Transfer or Exit Sale to the extent such expenses are incurred for the benefit of all Members and are not otherwise paid by the Company or another Person.[32]

---

[31] *Id.* at A2116 (emphasis added).

[32] *Id.* at A2114.

Importantly, Section 7(d) states that any Exit Sale must be on equal terms and conditions (the "Equal Treatment Provision"): "In the case of both a Tag-Along Transfer and an Exit Sale, (A) *each Unit Transferred in such Tag-Along Transfer and Exit Sale shall be Transferred on the same terms and conditions as each other Unit so Transferred . . . .*"[33] And like Section 7(c), Section 9(b) provides for a *pro rata* allocation of indemnification expenses:

> (b)  No Member shall be obligated in connection with any such Exit Sale (i) to agree to indemnify or hold harmless the Person to whom the Units are being sold with respect to any indemnification or other obligation in an amount in excess of the net proceeds paid to the such [sic] Member in connection with such Exit Sale or (ii) to enter into any non-competition, non-solicitation or other similar arrangement; <u>provided</u>, <u>further</u>, that such indemnification or other obligations shall be *pro rata* as among the Members other than with respect to representations made individually by a Member (e.g., representations as to title or authority of such Member or the lack of any encumbrance on any of the Units to be sold by such Member). *Allocation of the aggregate purchase price payable in an Exit Sale* will be determined by assuming that the aggregate purchase price was distributed to [Oxbow Holdings] and the remaining Members *in accordance with Article XI, Section 1* hereof.[34]

The last sentence of the provision quoted above states that proceeds from an Exit Sale will be distributed in accordance with Article XI, Section 1 (the "Distribution Provision"), which in turn refers to Section 2 of Article XI.  These sections provide:

> Section 1.  <u>Distributions</u>.  Subject to such conditions as may be imposed under any Financing Arrangements and to the prior payment of distributions pursuant to Article XI, Section 2, *all Net Cash Flow shall be distributed on a quarterly basis to the Members in accordance with their Percentage Interests* within 45 calendar days after the end of each Fiscal Quarter . . . .

---

[33] *Id.* (emphasis added).

[34] *Id.* at A2116 (emphasis added).

Section 2. <u>Mandatory Distributions</u>. Prior to making any distributions in respect of any quarter pursuant to Article XI, Section 2, the Company will make quarterly distributions to each Member, to the extent of Net Cash Flow, in an amount equal to such Member's Maximum Permitted Tax Amount; provided, that if the amount of Net Cash Flow is not sufficient to make the foregoing payments in full, the amount that is available will be distributed in the same proportion as if the full amount were available. . . .[35]

Thus, Section 2 of Article XI states that, prior to quarterly distributions, Oxbow will first pay the Members "in an amount equal to such Member's Maximum Permitted Tax Amount . . . ."[36] After that, Section 1 of Article XI provides that the remaining Net Cash Flow—including the Exit Sale proceeds—will be distributed "in accordance with their Percentage Interests."[37]

### III. The Court of Chancery's Decision

The Court of Chancery first evaluated the Small Holders' status as Members and held that they had not been properly admitted, but that the doctrine of laches barred the Minority Members' claim that they were not Members. Next, the court considered competing interpretations of the LLC Agreement to determine whether the Minority Members could force an Exit Sale. The court held that the plain language of the LLC Agreement did not allow the Minority Members to force an Exit Sale unless the Small Holders would receive 1.5x their initial capital contributions in the transaction, taking into account distributions received. Because the per unit amount must clear this requirement for every Member, and because every Member must receive the same amount, all Members

---

[35] *Id.* at A2106 (emphasis added).

[36] *Id.*

[37] *Id.*

22

must receive the highest amount needed to satisfy the 1.5x Clause for any particular Member. However, the court further held that a gap exists in the LLC Agreement relating to the terms on which the Small Holders had become Members. Relying on the implied covenant, the court "filled the gap" with a Seller Top-Off and held that the Minority Members can force an Exit Sale. Finally, the court held that Oxbow breached the Reasonable Efforts Provision, and, in a later opinion, crafted remedies in favor of the Minority Members.[38]

The trial court issued a 176-page post-trial opinion detailing the extrinsic evidence relating to the LLC Agreement and conduct of the parties, which it ultimately determined to be irrelevant in analyzing the plain meaning of the LLC Agreement. Because we conclude that the court erred in employing the implied covenant to imply a Seller Top-Off right, and because we agree with the Vice Chancellor's analysis of the plain meaning of the LLC Agreement, we confine our discussion below to those aspects of the trial court's post-trial decision.

### A. The Small Holders' Status as Members

The Minority Members argued at trial that Oxbow did not properly admit the Small Holders in 2011 and 2012. Specifically, Oxbow did not comply with the Preemptive Rights Provision, obtain supermajority approval under the Related Party Provision, or obtain the proper signatures, representations, and warranties under the New Member Provision at the time of the Small Holders' investment.

---

[38] *See In re Oxbow Carbon LLC Unitholder Litig.*, C.A. No. 12447-VCL (Del. Ch. Aug. 1, 2018).

The Court of Chancery held that Oxbow had the power as an entity to issue new units and to admit new Members, and so the failures to comply with the LLC Agreement were voidable acts subject to equitable defenses.[39] The court also found that, since 2011 and 2012, all relevant parties—including the Minority Members—had treated the Small Holders as valid Members. To support that conclusion, the court relied on the following facts:

- The Minority Members' Board representatives were present and participated in the 2011 vote to issue new units to the Small Holders. As part of the admission of the Small Holders, Crestview received about $8.2 million and its representatives believed that they were being undercompensated relative to Oxbow's true value.

- In 2012, Oxbow began listing the Small Holders as Members in a section of the monthly management reports titled "Member Equity." Specifically, the January 2012 report listed Family LLC as a Member and showed that $20 million had been distributed to the Members. Likewise, the April 2012 report listed Executive LLC as a Member and showed the distribution of $15 million. The Minority Members received these reports for seventy-two consecutive months.

- Oxbow's audited financial statements for 2011, 2012, and 2013, which the Minority Members received, reported the issuance of units to the Small Holders and identified those entities as Koch-controlled affiliates.

- In 2012 and 2013, Oxbow's auditor classified the Small Holders as Members in its report to the Audit Committee, which Hurst chaired.

- The Minority Members did not challenge the Small Holders' status as Members until August 31, 2016. Hurst testified that he was aware of the Small Holders' investments in 2012 and "just didn't make a big deal about it."[40]

Thus, the Court of Chancery held that laches barred the Minority Members' claim that the Small Holders are not Members.

---

[39] *Chancery Opinion*, 2018 WL 818760, at *48.

[40] *Id.* at *49.

## B. *The Highest Amount Interpretation Controls*

During this litigation, the Court of Chancery considered the parties' various shifting interpretations of the LLC Agreement to determine whether the Minority Members could force an Exit Sale. Oxbow advanced the Highest Amount Interpretation, meaning that Exit Sale proceeds must satisfy the 1.5x Clause for each Member based upon *pro rata* allocation of proceeds resulting from the Exit Sale, and that all Members must participate and receive the same consideration. The Minority Members, however, argued that the language of the LLC Agreement contemplated the Leave Behind Theory. Alternatively, if Members cannot be left behind in an Exit Sale, the Minority Members argued that a Top-Off payment should be implied. Using a Top-Off, some holders would receive greater consideration to satisfy the 1.5x Clause.

Although it had already determined in its summary judgment order that the Highest Amount Interpretation controlled, the Court of Chancery reconsidered the issue in its post-trial opinion "[f]or the sake of completeness."[41] The court stated that the Exit Sale Right could be construed to support the Leave Behind Theory if read in isolation. But the court held that, when read with other provisions in the LLC Agreement—particularly the definition of "Exit Sale," which requires a transfer of "all, but not less than all, of the then-

---

[41] *Id.* at *51. In its summary judgment order, the court held that "[a]s a matter of plain language, the Company's reading is correct." *Summary Judgment Order*, C.A. No. 12447-VCL, at ¶ 16. Further, it held that the plain language of the definition of "Exit Sale" contemplates a transaction "in which all members participate and in which all members receive a proportionate share of the consideration," and that it "does not contemplate a partial sale that would leave behind particular assets, portions of the Company, or investors," nor does it contemplate "a transaction in which some investors get greater amounts than others." *Id.* at ¶ 17.

outstanding Equity Securities of the Company"—the Leave Behind Theory collapses.[42]  In fact, the court noted several times that Koch had negotiated for a "Blocking Option" in 2007 to prevent the Small Holders from being left behind in an Exit Sale.[43]

The Court of Chancery then turned its attention to whether the LLC Agreement contemplates a Top-Off.  The court held that the combined effect of the Equal Treatment Requirements is to "require equal and ratable treatment of members in an Exit Sale."[44] Most notably, Section 7(d) expressly incorporates equal treatment, stating that units transferred in an Exit Sale "shall be Transferred *on the same terms and conditions* as each other Unit so Transferred . . . ."[45]  The court further noted that "[t]he price that a member receives for its units is a term of the transfer."[46]  Thus, Section 7(d) itself "forecloses having certain members receive greater consideration—different terms—than others."[47]

---

[42] *Chancery Opinion*, 2018 WL 818760, at *53 ("When the 1.5x Clause is read in light of the definition of Exit Sale, the Leave Behind Theory is no longer viable.").

[43] *See id.* at *3 ("The record at trial demonstrated that during the negotiations over the LLC Agreement, the majority member revised the 1.5x Clause to implement a Blocking Option."); *id.* at *7 (noting that in Oxbow Holdings' March 30, 2007 draft, "[t]he Leave Behind Option had flipped into a Blocking Option"); *id.* at *9 ("To my eye, Koch's revisions eliminated the Leave Behind Option and created a Blocking Option.  At trial, Koch testified that he revised the Exit Sale Right to implement a Blocking Option. . . .  Koch's testimony was logical and credible."); *id.* at *11 (stating that Oxbow Holdings circulated a draft LLC Agreement and noting that "[t]he language continued to contemplate a Blocking Option, consistent with Koch's revisions"); *id.* at *56 ("Although Crestview and ArcLight initially proposed the 1.5x Clause as a Leave Behind Option for ArcLight, Koch personally revised the provision to change it to a Blocking Option. Koch explained credibly what he was seeking to achieve, which fit with his economic interests at the time and matched up with the plain language of his changes.").

[44] *Id.* at *54.

[45] App. to Opening Br. at A2114.

[46] *Chancery Opinion*, 2018 WL 818760, at *54 (citations omitted).

[47] *Id.*

Next, the Court of Chancery considered and rejected the Waterfall Top-Off Theory, noting that the Exit Sale Right lacks any language permitting a priority return on capital. Instead, it held that "the Distribution Provisions establish a payment scheme that forecloses priority returns."[48]  In fact, the distribution provisions of the LLC Agreement require proceeds in an Exit Sale to be distributed "first so that members receive their Maximum Permitted Tax Amount, then *pro rata* 'in accordance with their Percentage Interests.'"[49] Hence, a "Waterfall Top Off would contravene these provisions and is not permitted."[50]

The Court of Chancery held that "[w]hen the 1.5x Clause is read in conjunction with the All Securities Clause and Equal Treatment Requirements, including the Distribution Provisions, then neither the Leave Behind Theory nor a Top Off is reasonable."[51]  The Vice Chancellor found that "[t]he final LLC Agreement did not expressly provide for a top off right."[52]  Thus, "[t]he practical result of these provisions when read together is to mandate the Highest Amount Interpretation."[53]  The trial court explained that, under the Highest Amount Interpretation:

> [If] an Exit Sale does not satisfy the 1.5x Clause for any member, then it cannot proceed.  To satisfy the 1.5x Clause for all members and to pay all members the same consideration, the Exit Sale must provide all members with the highest amount necessary to satisfy the 1.5x Clause for any member.[54]

---

[48] *Id.*

[49] *Id.* (quoting Article XI, Section 1 of the LLC Agreement (App. to Opening Br. at A2106)).

[50] *Id.*

[51] *Id.* at *56.

[52] *Id.* at *16.

[53] *Id.* at *56.

[54] *Id.*

The Vice Chancellor repeatedly emphasized that the Highest Amount Interpretation was the only reading that gives meaning to the LLC Agreement as a whole.[55] Although the trial court considered extrinsic evidence, it held that "[b]ecause the plain language of the Exit Sale Right mandates the Highest Amount Interpretation, extrinsic evidence is not relevant."[56] It observed, however, that although it reveals a range of views about the 1.5x Clause, the evidence "does not change the fact that the Highest Amount Interpretation is the only reading that gives meaning to the 1.5x Clause, the Exit Sale definition, and the Equal Treatment Requirements, including the Distribution Provisions."[57] And for good measure, the trial court reinforced that the Highest Amount Interpretation "is the only reasonable reading of the LLC Agreement."[58]

---

[55] *See id.* at *3 ("[T]he Highest Amount Interpretation is the only reading that gives effect to the LLC Agreement as a whole . . . ."); *id.* at *46 ("By Order dated August 10, 2016, I held that the plain language of the LLC Agreement, read as a whole, implemented the Highest Amount Interpretation and foreclosed the Leave Behind Interpretation. . . . I continue to adhere to that view."); *id.* at *50 ("I continue to believe that the meaning of the 1.5x Clause is clear when its language is read in the context of the LLC Agreement as a whole."); *id.* at *51 ("[T]his decision . . . holds that the plain language of [the 1.5x Clause], read in the context of the LLC Agreement as a whole, implements the Highest Amount Theory."); *id.* at *56 ("Because the meaning of the 1.5x Clause is plain when read in the context of the Exit Sale Right and the LLC Agreement as a whole, the parole evidence rule forecloses the consideration of that evidence [of the parties' interpretations, negotiation of the 1.5x Clause, and circumstances surrounding the issuance of units to Small Holders] for purposes of interpreting the Exit Sale Right."); *id* at *57 ("The fact that the Mintz Levin lawyers came to this reading [the Highest Amount Interpretation] late in the day is a reason to be skeptical about it, but it ends up being the only reading that gives meaning to the LLC Agreement when read as a whole.").

[56] *Id.* at *58.

[57] *Id.*

[58] *Id.*

## C. But the Trial Court Finds a Contractual Gap

The trial court next addressed the Minority Members' contention that the Koch Parties could not rely upon the Highest Amount Interpretation because the implied covenant of good faith and fair dealing prevented that result. The Minority Members argued that, under the implied covenant, the court should supply a Top-Off right. The Koch Parties countered that the plain language of the agreement precluded application of an implied covenant theory.

In analyzing these competing contentions, the court first considered the New Member Provision, which states that additional Members may be admitted and that "Units may be created and issued to such [new Members] as determined by the Directors on such terms and conditions as the Directors may determine at the time of admission."[59] Those terms "may provide for the creation of different classes or series of Units having different rights, powers and duties."[60] The court held that "[b]y deferring until a later point the question of what rights subsequent members would have, the LLC Agreement created a gap."[61]

Next, the court considered various facts which it found supported the finding of a gap in 2011. *First*, the relevant Board minutes and the resolutions the Board adopted did not specify "the rights that the members of Koch's family or the former sulfur-company

---

[59] App. to Opening Br. at A2093.

[60] *Id.*

[61] *Chancery Opinion*, 2018 WL 818760, at *60.

executives would have as members."[62] *Second*, the resolutions employed the term "shares of Company stock," which "implied a common-stock-like instrument without special rights, powers, preferences, or privileges, such as a preferential right to receive 1.5 times invested capital before being forced to engage in a sale."[63] *Third*, the court reasoned that Oxbow's failure to comply with corporate formalities had "created a gap regarding the terms on which the Small Holders became members."[64] Had Oxbow followed the proper formalities, it is "impossible to know what would have happened" given the Supermajority Vote requirement, which the Minority Members could have used as leverage to limit the Small Holders' ability to invoke the 1.5x Clause.[65] Accordingly, the trial court held that "[t]he Minority Members proved at trial that a gap exists in the parties' contract relating to the terms on which the Small Holders became members."[66]

The Court of Chancery next considered whether to imply a provision to fill that gap, noting that "[t]o supply an implicit term, the court 'looks to the past' and asks 'what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting.'"[67] Because the gap concerns the admission of the Small Holders, the court held that the relevant "time of contracting" was 2011, not when the parties executed the LLC Agreement in 2007. The Vice Chancellor concluded,

---

[62] *Id.*

[63] *Id.*

[64] *Id.* at *62.

[65] *Id.*

[66] *Id.* at *63.

[67] *Id.* at *60 (quoting *Gerber v. Enterprise Prods. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013)).

"[t]he evidence convinces me that it was possible, but unlikely, that the parties would have agreed to a Waterfall Top Off."[68] However, the evidence did convince the court "that the most likely outcome is that the parties would have agreed to a Seller Top Off."[69] Under this approach, "the Minority Members could complete an Exit Sale if they came up with sufficient additional funds to satisfy the 1.5x Clause for the Small Holders."[70] Critical to this holding was the trial court's focus on 2011, since "Koch testified that during the negotiations in 2007, any request by Crestview for a Top Off Option would have been a 'deal killer.'"[71]

## IV. Analysis

The Koch Parties claim that the Court of Chancery erred by: (1) applying the implied covenant of good faith and fair dealing to the LLC Agreement; (2) finding that a gap exists in the LLC Agreement regarding the operation of the 1.5x Clause; (3) holding that Oxbow Holdings breached the LLC Agreement's Reasonable Efforts Provision; and (4) awarding a contingent "backstop" remedy to the Minority Members, along with their *pro rata* share of certain legal fees and expenses. The Minority Members raise as their *lead* argument in defense of the trial court's opinion an argument they did not raise below, namely, that the

---

[68] *Id.* at *64. The trial court observed that "[b]ecause Koch and members of his family owned two thirds of Oxbow's units, they would bear two-thirds of the cost of a Waterfall Top Off." *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.* But as the trial court correctly observed, "[o]ne compelling reason to eschew filling a gap is if the parties actually negotiated over the issue, and the implied provision would give one side the benefit of a provision that it 'failed to secure . . . at the bargaining table.'" *Id.* at *66 (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) (Strine, V.C.)).

31

plain language of the LLC Agreement permits a Top-Off. Secondarily, they then defend the trial court's implied covenant analysis. For the following reasons, we conclude that the Court of Chancery correctly held that the Highest Amount Interpretation is the only reading that gives meaning to the 1.5x Clause, the Exit Sale definition, and the Equal Treatment Requirements, including the Distribution Provisions. However, we hold that the trial court erred in finding a contractual gap and in applying a Seller Top-Off. Thus, the effect of our decision is that the plain language of the LLC Agreement gives the Small Holders a right to block an Exit Sale by operation of the Highest Amount Interpretation.

A. *The Minority Members Abandoned the Small Holders' Rights Gap Theory*

Earlier in this litigation, the Minority Members advanced two theories under the implied covenant of good faith and fair dealing: the Small Holders' Rights Gap and the Top-Off Gap. Under the Small Holders' Rights Gap Theory, the LLC Agreement contains a contractual gap because the New Member Provision gives the Board discretion to determine the rights of newly-admitted Members, and because the Board failed to define those rights at the time of the Small Holders' admission. The Top-Off Gap Theory posits that a gap exists in the Exit Sale Right because it does not expressly permit or prohibit a Top-Off payment.

As noted above, the court first raised, *sua sponte*, an implied covenant theory in its summary judgment order, and then the Minority Members added an implied covenant claim in their Second Amended Counterclaim. However, they did not specifically argue

32

the Small Holders' Rights Gap Theory relied on by the Court of Chancery.[72]   Instead, in

their pre-trial briefing, the Minority Members primarily relied on the Top-Off Gap Theory,

and only vaguely referenced the Small Holders' Rights Gap.[73]  By the time of post-trial

briefing and oral argument, the Minority Members had abandoned their Small Holders'

Rights Gap Theory altogether.[74]  In its post-trial opinion, the Court of Chancery expressly

concluded that a Top-Off was not reasonable when reading the LLC Agreement as a whole

---

[72] *See* App. to Opening Br. at A1170 ("The LLC Agreement contains an implied covenant that provides, *inter alia*, (i) that an Exit Sale may proceed even if not every Member receives at least a return of 1.5 times its aggregate Capital Contributions through the Exit Sale; and (ii) any new Members in Oxbow who invested after Crestview and Load Line's original investment, particularly small holders, cannot block the Exit Sale right."); *id.* ("In the alternative, the LLC Agreement also contains an implied covenant that provides for any Member that would not otherwise receive 1.5 times its aggregate Capital Contributions in an Exit Sale to receive additional compensation to make up for the difference . . . .").

[73] The Small Holders' Rights Gap did not appear in the section of the Minority Members' pre-trial brief addressing the implied covenant.  Rather, in a section of the brief contesting the Small Holders' status as Members, the Minority Members asked the court to "fill the gap" and determine what rights the Board would have set at the time of the Small Holders' admission.  *Id.* at A696, A703.  That section ends with the following paragraph:

> If the Court concludes the Small Holders are Members of Oxbow, it must "fill the gap" and determine what rights the Board would have "determined" for them "at the time" of admission had the issue been discussed.  The Board would not have granted the Small Holders the right to block an Exit Sale and would have permitted them to be left behind in an Exit Sale.  The Court should declare that the Small Holders, even if Members, cannot block an Exit Sale.

*Id.* at A703.

[74] The Minority Members argued in post-trial briefing that the admission of the Small Holders was invalid, not that the New Member Provision contained gaps or that the admission process created a gap.  *See id.* at A1265–67.  At oral argument before this Court, the Minority Members cited examples in the record where they claim to have asserted the Small Holders' Rights Gap Theory in post-trial briefing or oral argument.  *See id.* at A1477 (post-trial reply brief), A1586–88 (post-trial oral argument).  But in neither of those instances did the Minority Members clearly argue the Small Holders Rights Gap Theory that they advance on appeal.  Rather, they argued that the procedural failures in the Small Holders' admission process rendered their admission ineffective and that the Minority Members did not foresee this scenario.  They did not articulate that a Top-Off option should be a consequence of the Board's inaction.

and that the Highest Amount Interpretation controls.[75] But the trial court then implied a Seller Top-Off, nonetheless, based on the Small Holders' Rights Gap Theory. In sum, the Court of Chancery first suggested the implied covenant theory *sua sponte*, rejected the primary Top-Off implied covenant theory that the Minority Members advanced pre- and post-trial, and held that a Top-Off was not reasonable under a plain reading of the contract, but then relied on the abandoned Small Holders Rights Gap Theory to ultimately imply a Top-Off payment right.[76]

We see another disconnect in the post-trial opinion. The trial court held that laches bars any challenge to the Small Holders' status as Members based on the failure to follow proper formalities in the Small Holders' admission process. But the trial court then used that same failure to serve as a basis for finding a contractual gap and employing the implied covenant to fill it. At a minimum, the trial court's reliance on the same factual predicate to bar one claim but to serve as a basis for another creates an untenable tension. Even if the Minority Members did not waive the Small Holders' Rights Gap Theory by abandoning it in the post-trial phase,[77] and even if the trial court's finding on laches (which the Minority

---

[75] *Chancery Opinion*, 2018 WL 818760, at *56.

[76] *See Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 191 (Del. Ch. 2014) (holding that the implied covenant was not properly invoked where the implied term would "conflict fundamentally with the plain language and structure" of the contract), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015). Here, the trial court concluded that the plain language of the LLC Agreement "forecloses a Top Off Option." *Chancery Opinion*, 2018 WL 818760, at *54.

[77] The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial. *See SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 n.71 (Del. Ch. June 16, 2009) ("[Defendant] did not address those claims in post-trial briefing, and they are waived." (citation omitted)); *In re IBP, Inc. v. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (deeming a party to have waived arguments that it did not present in its opening post-trial brief).

34

Members did not appeal) does not bar the assertion of an implied covenant claim, we conclude that the implied covenant claim is meritless.

## B. The Court of Chancery Erred by Finding a Small Holders' Rights Gap

Questions of law and contractual interpretation are reviewed *de novo*.[78] We conclude that the trial court erred in holding that "a gap exists in the parties' contract relating to the terms on which the Small Holders became members."[79]

A plain reading of the New Member Provision shows that the parties contracted to leave the terms of new Members' admission to the discretion of the Board. The New Member Provision states that "Units may be created and issued to such [new Members] as determined by the Directors on such terms and conditions as the Directors *may* determine at the time of admission," and those terms "*may* provide for the creation of different classes or series of Units having different rights, powers and duties."[80] The LLC Agreement's definition of "Member" "means any Person named as a member of the Company on <u>Exhibit A</u> attached hereto and *includes any person subsequently admitted as a Member*."[81] In other words, the LLC Agreement delegates responsibility to the Board to set the terms of admission and permits—but does not require—the Board to issue units with different rights or classes.[82] Absent the Board's imposition of different rights for newly issued units, the

---

[78] *See Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 n.140 (Del. 2018).

[79] *Chancery Opinion*, 2018 WL 818760, at *63.

[80] App. to Opening Br. at A2093 (emphasis added).

[81] *Id.* at A2080 (emphasis added).

[82] The Minority Members argue that determining the Small Holders' rights as to an Exit Sale was not truly discretionary because Article XIII, Section 5(b) requires mandatory action. Section 5(b) provides that "[i]f the Company proposes to issue Equity Securities, the Company will give each

definition of "Member" suggests that use of that term in the LLC Agreement, including the Exit Sale Right, applies to subsequently admitted Members.

The record shows that the Board admitted the Small Holders without imposing a different set of rights. The Subscription Agreement—which was addressed to the Board—set the price terms and number of units, and it stipulated that Family LLC "agrees to be bound by the terms of the" LLC Agreement.[83] The Minority Members' Board representatives then signed consents for the distribution of $20 million from Family LLC's investment, and the Minority Members received about $11.4 million as a result.[84] Further, the Board resolutions in April 2011 and the Board minutes in November 2011 only set terms regarding the price and number of units to be issued. Although the court took issue with the fact that the Board resolutions used the phrase "shares of Company stock" rather than "units,"[85] it appears that the parties used the term "unit," "share," and "stock" interchangeably.[86] Moreover, the 1.5x Clause is not "preferential," as the trial court

---

Member written notice of its intention, describing the Equity Securities and the price and terms and conditions upon which such Equity Securities are to be issued and/or sold." *Id.* at A2111. Oxbow contends in its briefing on appeal that it did give notice and cites to certain findings in the trial court's opinion. *See Chancery Opinion*, 2018 WL 818760, at *16–18. Even assuming the Koch Parties did not supply proper written notice, the Court of Chancery held that laches barred the Minority Members from challenging the Small Holders' status as Members. *See id.* at *47–50.

[83] App. to Opening Br. at A1911.

[84] *See id.* at A811, A941, A1913, A1915–16.

[85] *Chancery Opinion*, 2018 WL 818760, at *61 ("[T]his reference implied a common-stock-like instrument without special rights, powers, preferences, or privileges, such as a preferential right to receive 1.5 times invested capital before being forced to engage in a sale.").

[86] For example, the Board minutes on November 9, 2011, show that the Board "discussed the proposed *stock* purchase plan" regarding the purchase of "Company *units*," in which the Board agreed to issue "$15,000,000 of *stock* . . . [at] $300 per *share*." *Id.* (emphasis added); *see also id.* at *25 (Crestview email stating that one of its strategies was to "bring in a new investor to purchase

36

concluded, but rather applies to "any other Member"—which includes the Small Holders.[87]

Because the Board chose not to specify different rights, the terms of the LLC Agreement—including the unambiguous Exit Sale Right—apply with equal force to the Small Holders.

We have declined in other cases to imply new contract terms merely because a contract grants discretion to a board of directors. For example, in *Blaustein v. Lord Baltimore Capital Corp.*,[88] we considered a plaintiff's claim that a Shareholder Agreement included implied terms about share repurchasing.[89] The relevant provision stated that "the Company *may* repurchase Shares upon terms and conditions agreeable to the Company and the Shareholder who owns the Shares to be repurchased . . . ."[90] Noting that "[t]he implied covenant of good faith and fair dealing cannot be employed to impose new contract terms that could have been bargained for but were not," we held that the permissive language "gives both parties complete discretion in deciding whether, and at what price, to execute a redemption transaction."[91] We did not explicitly address whether a gap existed in *Blaustein*, but our reasoning in that case suggests—as do the facts here—that conferring discretion to the Board was a contractual choice to grant authority to the Board—not a gap. And although the vesting of a Board with discretion does not relieve the Board of its

---

enough of [Koch's] *shares* to give Crestview plus the new investor a majority interest" (emphasis added)).

[87] App. to Opening Br. at A2058.

[88] 84 A.3d 954 (Del. 2014).

[89] *Id.* at 956.

[90] *Id.* at 959.

[91] *Id.*

obligation to use that discretion consistently with the implied covenant of good faith and fair dealing,[92] the Minority Members do not argue that the Board exercised its contractual discretion in bad faith in admitting the Small Holders.[93]

Here, at the time of contracting in 2007, the parties contemplated that new Members could be admitted, and they placed certain restrictions on the Board's discretionary authority in the admission process. For example, the Preemptive Rights Provision protects

---

[92] *See Miller v. HCP Trumpet Investments, LLC*, 2018 WL 4600818, at *1–2 (Del. Sept. 20, 2018) (TABLE) (declining to imply *Revlon*-type fiduciary duties where the defendant board of directors had "sole discretion" to conduct a sales process, but noting that "the mere vesting of 'sole discretion' did not relieve the Board of its obligation to use that discretion consistently with the implied covenant of good faith and fair dealing"); *Amirsaleh v. Bd. of Trade of N.Y.C., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008) (Chandler, C.) ("[T]he law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith.").

[93] Thus, without limiting other possible applications, the implied covenant of good faith and fair dealing often comes into play in two situations. The one at issue here is when it is argued that a situation has arisen that was unforeseen by the parties and where the agreement's express terms do not cover what should happen. *See Cincinnati SMA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992–94 (Del. 1998) (considering, but rejecting, the plaintiff's argument that an additional non-compete obligation could be implied from a limited partnership agreement); *cf.* E. Allen Farnsworth, *Good Faith Performance and Reasonableness Under the Uniform Commercial Code*, 30 U. CHI. L. REV. 666, 671–78 (1963) (framing the implied covenant under the Uniform Commercial Code as a way of implying terms when the contract leaves an "open term"). The other situation, not present here, is when a party to the contract is given discretion to act as to a certain subject and it is argued that the discretion has been used in a way that is impliedly proscribed by the contract's express terms. *See Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581, 597 (Del. 1948) ("The question involved is one of good faith, proper motive and fair dealing, which by express terms or by implication is written into every contract. The term 'absolute judgment,' as indicated, means a judgment based upon sincerity, honesty, fair dealing and good faith, not one evidencing caprice or bad faith."); *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214, 215 (N.Y. 1917) (Cardozo, J.) ("His promise to pay the defendant one-half of the profits and revenues resulting from the exclusive agency and to render accounts monthly was a promise to use reasonable efforts to bring profits and revenues into existence."); *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 & n.1 (Del. Ch. 2009) (collecting authorities for the proposition that "[w]hen a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."); Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 HARV. L. REV. 369, 379–85 (1980) (framing the implied covenant in terms of legitimate and illegitimate uses of discretion).

existing Members from dilution, and the Related Party Provision requires supermajority approval for conflicted transactions. These provisions suggest that the parties considered the impact of new Members but decided to delegate other issues affecting unitholder rights to the Board. In addition to the Preemptive Rights and Related Party Provisions, the parties anticipated differing scenarios regarding a possible Exit Sale. For example, Oxbow Holdings' Exit Sale Right, contained in Article XIII, Section 9(a) of the LLC Agreement, implements a 2.5x threshold limited to Crestview and Load Line.[94] By contrast, the Minority Members' Exit Sale Right in Article XIII, Section 8(e) contains a 1.5x threshold and it applies to "any other Member."[95]

Even leaving aside the trial court's decision to focus on 2011 as the relevant time of contracting,[96] the parties' sloppiness and failure to consider the implications of the Small Holders' investment in 2011 did not equate to a contractual gap. Although Oxbow's handling of the issuances was hardly a model of good corporate governance, the Minority Members were highly sophisticated entities with three Board members who were capable

---

[94] App. to Opening Br. at A2116.

[95] *Id.* at A2115–16 (original Article XIII, Section 8(e), dated May 8, 2007); *see also id.* at A2058 (amended Article XIII, Section 8(e), dated February 13, 2014).

[96] *See, e.g.*, *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) ("The reasonable expectations of the contracting parties are assessed at the time of contracting."); *Blaustein*, 84 A.3d at 959 ("[T]he implied covenant is used in limited circumstances to include what the parties would have agreed to themselves had they considered the issue in their *original bargaining positions* at the time of contracting." (emphasis added) (internal quotation omitted)); *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("When conducting this [implied covenant] analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." (internal citations omitted)).

of reading the LLC Agreement and bargaining for the rights they now seek through litigation.[97]

In addition, the trial court did not persuasively explain why being alerted to the Preemptive Rights and Related Party Provisions would have caused the Minority Members to bargain for additional rights.[98]  As to the Supermajority Vote under the Related Party Provision, the court noted that the Minority Members "could have blocked the issuance and forced a negotiation."[99]  But the Crestview and Load Line directors voted *in favor* of the April 2011 resolutions and signed the consent forms regarding transfer of the funds from Executive LLC's unit-purchase.[100]  The court cited no evidence that the Minority Members felt that their hands were tied or that their vote was otherwise invalid.  Further, Hurst was aware of the Small Holders' investments and "just didn't make a big deal about

---

[97] *See Airborne Health*, 984 A.2d at 147 (holding that the implied covenant does not apply where sophisticated parties "represented by able counsel" opted not to include provisions that "are familiar to any transactional lawyer"); *Corporate Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *5 (Del. Ch. Apr. 10, 2008) (Strine, V.C.) (denying application of the implied covenant where the parties were sophisticated, the provision sought was well known, and the parties bargained over related issues but did not secure the term they sought to have implied).

[98] The trial court found that it is "impossible to know what would have happened if Koch and his team had documented the issuances properly." *Chancery Opinion*, 2018 WL 818760, at *62.

[99] *Id.*

[100] In addition, before they signed the consents, the Minority Members were aware from the Subscription Agreement that Koch was the sole member of Executive LLC.  *See* App. to Opening Br. at A1911, A1913, A1915–16.  As the Court of Chancery properly held, this was enough to at least put the Minority Members on inquiry notice of their rights under the LLC Agreement.  *See Chancery Opinion*, 2018 WL 818760, at *49.

it."[101]  Instead, the Small Holders paid $35 million for their units, and the Minority Members promptly accepted the resulting $11 million distributions.[102]

The crucial problem with the Court of Chancery's reasoning is that it posits that a gap was created in the parties' contract because they did not give adequate attention to the effect that the admission of new Members at a higher entry price would have on the Exit Sale Right provisions of the agreement. The Court of Chancery's analysis hinged on the assumed negotiation that would have taken place between Koch and Crestview if Crestview had focused on the effect of the Small Holders' entrance on the Exit Sale Right's hurdle rate and concluded that it would have impaired Crestview's ability to force an Exit Sale. But as the trial court found, Crestview was not focused on this issue because in late 2011 and early 2012, Crestview assumed that the Oxbow's value had grown so much that it would be easy for any arms'-length sale of Oxbow to generate a return that would easily exceed any required hurdle rate necessary to force an Exit Sale.[103]

But even if the record lacked an explanation for the parties' failure to focus on this issue, the Court of Chancery's use of that failure to generate a gap would still be incorrect.

---

[101] *Chancery Opinion*, 2018 WL 818760, at *49.

[102] Oral Argument Video at 23:24, https://livestream.com/DelawareSupremeCourt /events/8478620/videos/184937241.

[103] *Chancery Opinion*, 2018 WL 818760, at *19 ("There is some reason to think that Crestview's principals were not overly concerned with the issuances to the Small Holders because of the valuation that they placed on Oxbow. Using multiples ranging from seven to ten times EBITDA, Crestview was forecasting exit values in a sale of Oxbow from $283.34 to $452.04 per unit. Crestview generally believed that a multiple of ten times EBITDA was appropriate for Oxbow. Crestview projected that Oxbow would generate EBITDA of $566 million in 2015, supporting a potential exit at close to $560 per unit. Oxbow in fact achieved EBITDA of $571.6 million in 2011." (footnotes omitted)).

Based on its own detailed findings, the Court of Chancery held that the parties agreed and expected that the Small Holders would be admitted as Members.[104] As such, whatever mistake the parties subjectively made about the implications of admitting new Members does not operate to create a contractual gap. And, the well-reasoned analysis of the Court of Chancery as to laches also shows why there is no inequity to the Minority Members in applying the provisions of the LLC Agreement as written.[105] The Small Holders were admitted as Members; everyone understood that they were Members; the Minority Members only challenged their status four years after they were admitted as part of this litigation; the Small Holders paid for the right to be Members; and the Minority Members received $11.4 million of that cash as part of a distribution. They therefore cannot in good faith argue that the Small Holders are not Members. Thus, as Members, the Small Holders have the rights and privileges of other Members. As such, the formula for applying the Exit Sale Provision simply had to be applied on that basis, and an Exit Sale could only be insisted upon by the Minority Members if all Members, including the Small Holders, received 1.5x their initial capital contribution.[106]

---

[104] *Id.* at *20 ("Despite not satisfying these formal requirements, everyone treated the Small Holders as members.").

[105] *See id.* at *50 ("[The Minority Members] received their share of the Small Holders' capital contributions when Oxbow distributed them, and all distributions since then have included the Small Holders. Oxbow's financial statements, and presumably its tax returns, have all reflected an ownership structure in which the Small Holders were members. It would be unfairly prejudicial to permit a belated challenge to their status as members to go forward at this point. Laches bars the Minority Members' objection to the status of the Small Holders as members.").

[106] *Id.* at *50–56 ("The practical result of these provisions when read together is to mandate the Highest Amount Interpretation. [If] an Exit Sale does not satisfy the 1.5x Clause for any member, then it cannot proceed. To satisfy the 1.5x Clause for all members and to pay all members the

The implied covenant of good faith is a "cautious enterprise"[107] that "is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[108] "Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[109] Rather, "the covenant is a limited and extraordinary legal remedy."[110] As such, the implied covenant "does not apply when the contract addresses the conduct at issue,"[111] but only "when the contract is truly silent" concerning the matter at hand.[112] Even where the contract is silent, "[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties, and 'should

---

same consideration, the Exit Sale must provide all members with the highest amount necessary to satisfy the 1.5x Clause for any member.").

[107] *Nemec*, 991 A.2d at 1125 (quotation omitted).

[108] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).

[109] *Nemec*, 991 A.2d at 1128. The trial court's opinion suggests a use of the implied covenant to correct what it viewed as an extreme, harsh, and unforeseen result arising from a plain reading of the LLC Agreement. *See Chancery Opinion*, 2018 WL 818760, at *3 ("Although the Highest Amount Interpretation is the only reading that gives effect to the LLC Agreement as a whole, it produces an extreme and unforeseen result in this case because of the failure to address the Small Holders' rights when the Company admitted them as members in 2011 and 2012."); *id.* at *67 ("This is the rare case in which issues of compelling fairness call for deploying the implied covenant."); *id.* at *73 ("Issues of compelling fairness call for deploying the implied covenant here because, otherwise, the fortuitous and poorly documented admission of the Small Holders would vitiate the Exit Sale Right.").

[110] *Nemec*, 991 A.2d at 1128.

[111] *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015); *see also Dunlap*, 878 A.2d at 441 ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement.").

[112] *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006) (Strine, V.C.).

43

be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[113]

We decline to apply the implied covenant here because no gap exists concerning the admission of the Small Holders, and because the admission of new Members and their impact on the Exit Sale process could have been anticipated. As explained above, the Minority Members bargained for certain protections regarding the admission of new Members. The parties could have also limited the 1.5x Clause to certain Members, excluded subsequently admitted Members, removed the "all, but not less than all" language, as the parties did with their 2014 amendment to the Put Right,[114] or revised the Exit Sale Right to include a Top-Off option when they amended that provision in 2014— *after* the Small Holders invested and *after* Crestview began contemplating an exit.[115] But they did not. Rather, the Board admitted the Small Holders without altering the rights applicable to all other Members.

---

[113] *Nationwide*, 112 A.3d at 897 (quoting *Allied Capital*, 910 A.2d at 1035).

[114] *Compare* App. to Opening Br. at A2057 *with id.* at A2114.

[115] *See Chancery Opinion*, 2018 WL 818760, at *19 ("When Oxbow issued the units to the Small Holders, Crestview's principals were aware of the 1.5x Clause, and the firm was evaluating its alternatives for exiting from Oxbow. They had already discussed potential exit scenarios with Koch."); *see also Summary Judgment Order*, C.A. No. 12447-VCL, at ¶ 23(c) ("[T]he parties negotiated the Third Amendment after the Small Holders invested, and that amendment specifically addressed the Exit Sale Right. The Third Amendment made no change to the 'all but not less than all' language included in the definition of Exit Sale, even though it disposed of that limitation for the Minority Members' Put Right."). Additionally, the Court of Chancery acknowledged in its summary judgment order that, in 2011, the Minority Members' Board representatives could have anticipated the implications of the Small Holders' admission "and addressed it then as a condition of the Small Holders' investment." *Id.* at ¶ 23(c).

44

For certain, the parties are in a far different position than they were in 2007 or 2011. As the Court of Chancery recognized, since the Minority Members exercised the Exit Sale Right nearly nine years after finalizing the LLC Agreement, Oxbow's management has changed, Koch has lost some of his initial bargaining leverage, and—at least compared to Crestview's expectations around 2011—the value of Oxbow has declined.[116] However, we reiterate that the implied covenant should not be used as "an equitable remedy for rebalancing economic interests"[117]—particularly where, as here, the parties are sophisticated business persons or entities.[118]

In sum, we agree with the Court of Chancery that the Highest Amount Interpretation is the only reading that gives effect to the LLC Agreement as a whole, but we hold that the trial court erred in finding a gap in the LLC Agreement and in using the implied covenant to imply a Seller Top-Off right.

### C. The Minority Members did not Fairly Present their New Plain Language Argument Below

Consistent with the parties' shifting theories in this litigation, the Minority Members' answering brief on appeal now casts their implied covenant Top-Off argument below as a *plain language* claim. Specifically, they argue that the Exit Sale Right and the Equal Treatment Provisions are silent as to whether the Minority Members can redistribute

---

[116] *See, e.g.*, *Chancery Opinion*, 2018 WL 818760, at *19, *24, *38, *65.

[117] *Nemec*, 991 A.2d at 1128.

[118] *West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 985 A.2d 391 (Del. 2009).

their Exit Sale proceeds in the form of a Top-Off, and that a Top-Off fulfills the purposes of the LLC Agreement.  In other words, they ask us to imply a Top-Off based upon the LLC Agreement's plain language.  Because this argument was not fairly presented below, however, we decline to reach its merits.

Not only was this new plain language theory not fairly presented below, it conflicts with the positions the Minority Members actually did take.[119]  In fact, their principals acknowledged that there was no such right to a Top-Off payment in the LLC Agreement.  For example, Hurst testified in deposition:

> Q: Now, did Crestview ever negotiate for the right to be able to make a top-off payment in the event that the exit sale did not result in the fair market value being achieved?
> . . .
>
> A: I don't believe so.
> . . .
>
> Q: You didn't tell the investment committee that you understood that Crestview had a top-off payment right, did you?
>
> A:  We did not have a top-off payment right.[120]

Further, in the proceedings below, the Minority Members argued that "the LLC Agreement contains a gap *because it does not explicitly permit or prohibit a top-up payment* to a particular member to satisfy the 1.5x Clause."[121]  Thus, we conclude that the Minority Members' new "plain language" argument is waived.

---

[119] *See Nationwide*, 112 A.3d at 892 (noting that a party "did not fairly raise a . . . claim at trial" when "for much of trial" it argued a contrary point).

[120] App. to Reply Br. at AR106, AR117.

[121] App. to Opening Br. at A671 (emphasis added).  The Minority Members only arguably raised the Top-Off plain language argument in correspondence below.  *See* App. to Answering Br. at

*D. We Vacate the Court of Chancery's Remedies Decision*

The Koch Parties contend that the Court of Chancery erroneously determined that they breached the Reasonable Efforts Provision and that the court's remedies constitute error. Specifically, the Koch Parties argue that "because there was no Exit Sale available that could satisfy the LLCA's express requirements under prevailing market conditions, there was no Exit Sale for Oxbow Holdings to use reasonable efforts to effectuate."[122] We agree and, accordingly, vacate the remedies ruling of August 1, 2018.

V.    *Conclusion*

For the foregoing reasons, we AFFIRM in part and REVERSE in part the Court of Chancery's February 12, 2018, decision, and we VACATE the court's August 1, 2018, remedies decision.

---

B248–51. Although the trial court was aware of these communications, that does not excuse the advancing parties' failure to properly brief and argue them.

[122] Opening Br. at 54.