# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CHARLES F. DOLAN, HELEN A. DOLAN, JAMES L. DOLAN, PATRICK F. DOLAN, COLLEEN McVEY, and DANIELLE CAMPBELL,<br><br>Plaintiffs,<br><br>v.<br><br>ALTICE USA, INC., and ALTICE EUROPE N.V.,<br><br>Defendants,<br><br>and<br><br>CABLEVISION SYSTEMS CORPORATION and NEWS 12 NETWORKS, LLC,<br><br>Nominal Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2018-0651-JRS |

## MEMORANDUM OPINION

Date Submitted: April 22, 2019
Date Decided: June 27, 2019

John L. Reed, Esquire, Matthew Denn, Esquire, and Peter H. Kyle, Esquire of DLA Piper LLP (US), Wilmington, Delaware and Robert M. Hoffman, Esquire and James C. Bookhout, Esquire of DLA Piper LLP (US), Dallas, Texas, Attorneys for Plaintiffs.

Daniel A. Mason, Esquire and Brenda W. Sullivan, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware; Kevin G. Abrams, Esquire and J. Peter Shindel, Jr., Esquire of Abrams & Bayliss LLP, Wilmington, Delaware; and Jay Cohen, Esquire and Daniel H. Levi, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Plaintiffs, Charles F. Dolan, Helen A. Dolan, James L. Dolan and Patrick F. Dolan (together, the "Dolan family"), are the founders of Cablevision Systems Corp., a publically traded Delaware corporation and one of the largest cable operators in the United States. On September 16, 2015, Cablevision, Altice N.V. and Neptune Merger Sub Corp. entered into an Agreement and Plan of Merger (the "Merger Agreement") whereby Altice agreed to pay $34.90 per share of Cablevision stock, resulting in total merger consideration of $17.7 billion (the "Merger").

Among the assets within the Cablevision family acquired in the Merger were a cohesive group of regional cable news television channels, known collectively as News12 Networks LLC ("News12"), which serve approximately three million households in New Jersey, Connecticut and New York, including two boroughs of New York City and most of Long Island. News12 provides hyper-local, 24-hour news coverage in a manner that is unique in the United States. The Dolan family were particularly fond of News12 and protective of its legacy. They initially sought to carve out News12 from the Merger but eventually relented to pressure from Altice to include the stations in the transaction. In exchange for doing so, the Dolan family bargained for a commitment from Altice, memorialized in the Merger Agreement at Section 6.4, that Altice would operate News12 "substantially in accordance with the existing News12 business plan . . . through at least the end of plan year 2020[.]"

1

Shortly after the Merger closed, the Dolan family discovered that Altice had laid off several News12 employees and planned to lay off more, allegedly in violation of the News12 business plan as incorporated in the Merger Agreement. When Altice declined to rescind the layoffs or commit to honor the News12 business plan, the Dolan family, along with two News12 employees, initiated this action to obtain specific performance of the Merger Agreement.

Altice has moved to dismiss. Pointing to the survival clause in the Merger Agreement, Altice contends that the commitment to honor the News12 business plan was expressly not among the covenants that survived the closing of the Merger. It also argues the Dolan family are not parties to, or third-party beneficiaries of, the Merger Agreement and, thus, lack standing to seek specific performance of that contract. The Dolan family counter that, notwithstanding the Merger Agreement's survival clause, the covenant at issue, by its terms, extends beyond closing to "at least the end of plan year 2020[.]" They also maintain they are either parties to the Merger Agreement, even though not identified as such, or third-party beneficiaries, even though the Merger Agreement expressly disclaims the existence of third-party beneficiaries. According to the Dolan family, if they are not deemed parties to or third-party beneficiaries of the Merger Agreement, then there will be no one to enforce Section 6.4, a provision included in the Merger Agreement expressly for their benefit. In reply, Altice acknowledges that its construction of the Merger

Agreement would reduce Section 6.4 to an aspirational, albeit unenforceable, expression of then-present intent. To the extent the Dolan family thought they had obtained more, they negotiated a "bad deal."

In this Memorandum Opinion, I find that the contested clauses of the Merger Agreement, when read together, are ambiguous. On the one hand, there are provisions within the Merger Agreement that, by operation, would render Section 6.4 unenforceable. The survival clause does not reference Section 6.4, which suggests the clause did not survive the closing of the Merger. The Merger Agreement also states that there are no third-party beneficiaries. On the other hand, Section 6.4 expressly contemplates that Altice will have performance obligations that extend well beyond closing. And, by its terms, Section 6.4 is clear that the beneficiaries of Altice's commitment to operate News12 according to the News12 business plan are not parties to the Merger Agreement and, therefore, could only enforce that commitment as third-party beneficiaries. Before determining that Section 6.4 is, as Altice maintains, nothing more than nugatory placation, it is, in my view, appropriate to receive parol evidence to discern if that was the parties' intent.[1]

---

[1] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) ("On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents.").

For the reasons explained below, the motion to dismiss the Dolan family's breach of contract and related declaratory relief claims is denied.[2] The motion to dismiss several of the claims pled as alternatives to breach of contract—breach of the implied covenant of good faith, fraudulent inducement and equitable fraud—is granted. All of these claims are supplanted by the breach of contract claim. In other words, if there is an enforceable contract upon which Plaintiffs may rest their claims, then there is no gap to fill with the implied covenant, there is no need to bootstrap fraud and contract claims, and there is no special relationship to support equitable fraud. The claim for promissory estoppel survives, however, on the theory that if there is no contract between the Dolan family and Altice, as Defendants argue, then the Dolan family has adequately pled there was an extra-contractual promise made by Altice with the reasonable expectation that it would induce action, reasonable and detrimental reliance upon the promise by the Dolan family, and a risk of injustice if the promise is avoided.

## I.  FACTUAL BACKGROUND

I draw the facts from the allegations in the Complaint, documents incorporated by reference or integral to the Complaint and judicially noticeable facts

---

[2] As explained below, I do find that Plaintiffs McVey and Campbell lack standing to enforce the Merger Agreement as either parties or third-party beneficiaries. Their breach of contract claims, therefore, must be dismissed.

4

available in public Securities and Exchange Commission filings.[3]  For purposes of

this motion to dismiss, I accept as true the Complaint's well-pled factual allegations

and draw all reasonable inferences in Plaintiffs' favor.[4]

## A.  The Parties

Plaintiff, Charles F. Dolan, is the founder and former CEO of Cablevision

Systems Corp.[5]  Prior to the Merger, he held a 14.1% interest in Cablevision.[6]

His wife, Helen A. Dolan, also held a 14.1% interest.[7]  One of their sons, James L.

Dolan, held a 3.3% interest and is a former CEO of Cablevision.[8]  Another son,

Patrick F. Dolan, held a 1.8% interest and was President of News12 at the time of

and after the Merger.[9]

---

[3] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) (noting that trial courts may take judicial notice of facts in SEC filings that are "*not* subject to reasonable dispute") (emphasis in original).

[4] *Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 169.

[5] Pls.' Verified Second Am. Compl. ("SAC") ¶ 11.

[6] *Id.*

[7] *Id.* ¶ 12.

[8] *Id.* ¶ 13.

[9] *Id.* ¶¶ 14, 53.

Plaintiffs, Colleen McVey and Danielle Campbell, are current employees of News12, but both are slated to be terminated.[10] McVey, an Emmy award-winning news anchor, has worked at News12 for over 30 years.[11] She regularly appears on air at News12's leading network, News12 Long Island.[12] Campbell, also an Emmy and Edward R. Murrow award-winning news anchor, has worked at News12 for almost 30 years.[13] Viewers rate Campbell above average as compared to other Long Island reporters and she earns a high awareness score among the viewing public.[14]

Defendants, Altice USA and Altice Europe, are cable, fiber, telecommunications, content and media companies. Altice USA, a Delaware corporation, operates in the United States.[15] Altice Europe, a Dutch *naamloze vennootschap* (i.e., a Netherlands public limited liability company), is the parent of communications companies that operate in Europe, Israel and the Dominican

---

[10] *Id.* ¶¶ 15–16.

[11] *Id.* ¶ 25.

[12] *Id.* ¶ 9.

[13] *Id.* ¶ 26.

[14] *Id.* ¶ 27.

[15] *Id.* ¶ 17.

Republic.[16]  Both Altice USA and Altice Europe are successors in interest to Altice N.V.[17]

Nominal Defendant, Cablevision, a Delaware corporation, is wholly-owned and operated by Altice.[18]  The Dolan family founded and led Cablevision until Altice acquired Cablevision in 2015.[19]

Nominal Defendant, News12, a Delaware limited liability company, is a local television network that provides 24-hour "hyper-local" news coverage concentrating on distinct geographic areas including New Jersey, Connecticut and New York City.[20]  Altice acquired News12 as part of the Merger.[21]

## B. The Merger

In 2015, Altice and the Dolan family began discussing Altice's possible acquisition of Cablevision.[22]  Initially, the Dolan family declined to include News12 in the transaction, proposing instead to spin off the asset to an entity they

---

[16] *Id.* ¶ 18.

[17] *Id.* ¶¶ 17–18.

[18] *Id.* ¶ 19.

[19] *Id.* ¶ 24.

[20] *Id.* ¶¶ 20, 38.

[21] *Id.* ¶¶ 4, 24.

[22] *See id.* ¶ 30.

controlled.[23]  After intense negotiations with Altice, the Dolan family relented and agreed to include News12 in the Merger in exchange for assurances in the Merger Agreement that Altice would operate News12 in a manner that preserved its employee base, quality reporting and programming.[24]

The Dolan family, all of whom were members of Cablevision's "controlling stockholder group," were not named as parties to the Merger Agreement, but were represented by Debevoise & Plimpton LLP in the transaction negotiations.[25] As negotiations continued, Altice determined that it would be useful to lock up the Dolan family's shares in favor of the Merger.  Here again, comforted that Altice had committed to preserve the News12 asset, the Dolan family relented and committed by Written Consent to vote their substantial Class B shares "in favor of adoption of the Merger Agreement."[26]

Cablevision, Altice N.V. and Neptune Merger Sub Corp. entered into the Merger Agreement on September 16, 2015.[27]  The Merger consideration totaled

---

[23] *Id*. ¶¶ 29–30, Ex. C at 16.

[24] SAC ¶ 30.

[25] *Id*. Ex. C at 19.  Cablevision was represented separately by Sullivan & Cromwell. *Id.* Ex. C at 17.

[26] *See* SAC ¶ 30, Ex. C at 16, 19, 20, 71.

[27] SAC ¶¶ 5, 31.

$17.7 billion.[28]  Of that amount, the Dolan family received over $2.2 billion, or approximately 20% of the cash component of the Merger consideration.[29] The transaction closed on June 21, 2016.[30]

## C. The Merger Agreement

As noted, in exchange for the Dolan family's agreement to include News12 in the Merger, Altice agreed to include a covenant in the Merger Agreement (Section 6.4(f)) that it would operate News12 in accordance with the station's then-existing business plan:[31]

> (i) Parent will operate News12 Networks LLC ("News12") from and after [June 21, 2016] [("]the Closing[")] substantially in accordance with the existing News12 business plan (the "News12 Business Plan"), a true and complete copy of which is included in Schedule 6.4(f) of the Company Disclosure Letter, as the same may be adjusted as provided in Scheduled 6.4(f), through at least the end of plan year 2020 within the current News12 footprint as of the date of this Agreement.
> (ii) The Company will operate News12 in accordance with the existing News12 Business Plan through the Closing.
> (iii) Either party may make reference to Section 6.4(f) and to Schedule 6.4(f) of the Company Disclosure Letter in connection with securing franchise and other regulatory approvals.[32]

---

[28] *Id.* ¶ 23, Ex. C at 2.

[29] *See* SAC Ex. C at 77.

[30] SAC ¶ 31.

[31] *See id.* ¶¶ 33–34.

[32] *Id.* ¶¶ 34–35, Ex. A § 6.4(f) (emphasis omitted).

9

As referenced in Section 6.4(f), the Merger Agreement incorporated the News12 Business Plan in Schedule 6.4(f).[33] Among other things, that plan provides for News12 to employ a full-time equivalent headcount of 462 employees for a five-year period—plan years 2016 through 2020.[34] The Business Plan also confirms that Altice will not materially modify News12's content or decrease any of the budgeted expenses, unless News12 should sustain a loss of $60 million or more, in which case Altice would be free to modify the plan as needed.[35]

Although, as a practical matter, the Dolan family and News12 employees are the beneficiaries of Section 6.4(f), the Merger Agreement, at Section 9.8, disclaims the existence of third-party beneficiaries:

> Except (i) as provided in Section 6.10 (*Director and Officer Liability*) or Section 9.15 (*Financing Sources*) and (ii) for the right of holders of Shares as of the Effective Time, after the Effective Time, to receive the aggregate consideration payable pursuant to Article IV of this Agreement, which rights set forth in clauses (i) and (ii) of this Section 9.8 are hereby expressly acknowledged and agreed by Parent and Merger Sub, **Parent and the Company hereby agree that their respective representations, warranties and covenants set forth in this Agreement are solely for the benefit of the other party hereto, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person other than the parties hereto any rights or remedies hereunder**, including the right to rely upon the representations and

---

[33] *Id.*

[34] SAC ¶ 36, Ex. B.

[35] SAC ¶ 37, Ex. A, Schedule 6.4(f).

warranties set forth herein . . . . The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto.[36]

The Merger Agreement also contains a survival provision at Section 9.1:

> This Article IX and the agreements of the Company, Parent and Merger Sub contained in Article IV and Sections 6.8 (*Employee Benefits*), 6.9 (*Expenses*) and 6.10 (*Director and Officer Liability*) shall survive the consummation of the Merger and the Transactions. This Article IX and the agreements of the Company, Parent and Merger Sub contained in Section 6.9 (*Expenses*), Section 6.11 (*Financing*), Section 6.12 (*Indemnification Relating to Financing*) and Section 8.5 (*Effect of Termination and Abandonment*) and the Confidentiality Agreement shall survive the termination of this Agreement. **All other representations, warranties, covenants and agreements in this Agreement shall not survive the consummation of the Merger and the Transactions or the termination of this Agreement.**[37]

As the provision clearly reflects, the Parties agreed that only certain covenants, representations, warranties and agreements would survive the consummation or termination of the Merger. Section 6.4(f) was not among them.

Finally, the parties agreed in Section 6.8(e), entitled "Employee Benefits," that:

> **Nothing contained in this Agreement is intended to** (1) be treated as an amendment of any particular Company Plan, (2) prevent Parent, the Surviving Corporation or any of their Affiliates from amending or terminating any of their benefit plans or, after the Effective Time, any Company Plan in accordance with their terms, **(3) prevent Parent, the Surviving Corporation or any of their Affiliates, after the Effective**

---

[36] SAC Ex. A § 9.8 (bold emphasis supplied).

[37] *Id*. § 9.1 (bold emphasis supplied).

11

**Time, from terminating the employment of any Continuing Employee, or (4) create any third-party beneficiary rights in any employee of the Company** or any of its Subsidiaries, any beneficiary or dependent thereof, or any collective bargaining representative thereof.[38]

### D. News12 after the Merger

In the spring of 2017, after the Merger closed, Altice terminated approximately 70 employees, allegedly "in direct violation of Section 6.4(f)."[39] At the time, Patrick Dolan was President of News12 and opposed the layoffs to no avail.[40] The layoffs decreased News12's salary spend by about $7 million—dropping Operating Expenses to levels under the allocations in Section 6.4(f).[41]

After the 2017 layoffs, Altice developed a plan to lay off 10% of News12 employees each year.[42] On August 21, 2018, Altice's controlling stockholder, Patrick Drahi, wrote to Patrick Dolan to confirm the planned layoffs.[43] The downsizing plan contemplates that McVey and Campbell will be among the first

---

[38] *Id.* § 6.8(e) (emphasis supplied).

[39] SAC ¶¶ 44–45.

[40] *Id.* ¶¶ 14, 53.

[41] *Id.* ¶ 45.

[42] *Id.* ¶ 46.

[43] *Id.* Altice intended to initiate the layoffs on September 6, 2018, but the planned layoffs have been suspended pending the outcome of this litigation.

of the News12 employees to lose their jobs.[44]  Michael Schreibner, President of Altice USA News, explained that the layoffs were necessary to give News12 a "fresh look."[45]  According to Plaintiffs, the termination of long-time, beloved news anchors, coupled with the planned structural changes, will negatively affect News12's ability to maintain its historic level of quality and hyperlocal news content.[46]

## E. Procedural Posture

On September 4, 2018, Plaintiffs initiated this action specifically to enforce Section 6.4(f) and to enjoin Altice from terminating any News12 employee other than "for obvious cause" or otherwise operating News12 in deviation of the News12 Business Plan as incorporated in the Merger Agreement.[47]  Plaintiffs amended their Complaint to add Danielle Campbell as a plaintiff on October 1, 2018.[48] Defendants then moved to dismiss.  By stipulation of the parties, Plaintiffs filed the now-operative Verified Second Amended Complaint (the "Complaint") on March 12, 2019, to include a request that the Court appoint a monitor to enforce Altice's

---

[44] *Id.* ¶¶ 48–49.

[45] *Id.*

[46] *Id.* ¶¶ 45, 49.

[47] D.I. 1 at 32 (Prayer for Relief).

[48] D.I. 17.

specific performance of Section 6.4(f) and to enhance the allegations in support of their breach of the implied covenant of good faith and fair dealing claim.[49]

In the Complaint, Plaintiffs assert six causes of action: breach of contract,[50] breach of the implied covenant of good faith and fair dealing,[51] equitable fraud,[52] promissory estoppel,[53] negligent misrepresentation,[54] and declaratory relief.[55] Plaintiffs seek specific performance, injunctive relief, monetary damages, recoverable costs, attorneys' fees and pre-judgment and post-judgment interest.[56]

Plaintiffs filed a Motion for a Temporary Restraining Order on October 9, 2018, along with their initial complaint. After several hearings to consider that motion were adjourned, the parties submitted a proposed status quo order.[57] The Court entered that order on February 13, 2019, prohibiting Altice from terminating

---

[49] D.I. 52, Ex. A.

[50] SAC ¶¶ 51–69.

[51] *Id.* ¶¶ 70–77.

[52] *Id.* ¶¶ 78–85.

[53] *Id.*

[54] *Id.* ¶¶ 86–90.

[55] *Id.* ¶¶ 91–92.

[56] *Id.* at 40–41 (Prayer for Relief).

[57] *Id.*

any News12 employee during the pendency of this litigation, except for actual, *bona fide* cause or upon approval of the Court.[58]

## II.  ANALYSIS

In considering a motion to dismiss, "(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; [and] (iii) the Court must draw all reasonable inferences in favor of the non-moving party[.]"[59]  This is to say, "Delaware follows a simple notice pleading standard."[60]  "To meet this standard and survive a Rule 12(b)(6) motion to dismiss, a plaintiff must make allegations in its complaint which provide the defendant with sufficient notice of the basis for the plaintiff's claim."[61]  The court may grant a motion to dismiss only if the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[62]

---

[58] D.I. 46.

[59] *Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168.

[60] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 912 (Del. Ch. 1999) (citing *Byrne v. Lord*, 1996 WL 361503, at *3 (Del. Ch. June 11, 1996)).

[61] *Id.* (citing *Byrne*, 1996 WL 361503, at *3).

[62] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002).

Questions of contractual interpretation generally are questions of law well suited for a motion to dismiss.[63] With that said, the Court cannot select one reasonable interpretation of a contract provision over another as a basis for dismissal.[64] Rather, "[d]ismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the only reasonable construction as a matter of law."[65]

**A. Have Plaintiffs Adequately Pled A Breach of Section 6.4(f)?**

Not surprisingly, as with most contracts, the Merger Agreement features some boilerplate, some bespoke provisions and some bespoke boilerplate. The question presented here is whether the boilerplate and bespoke boilerplate should be construed, as a matter of law, to render a bespoke provision superfluous. I consider that question, in parts, below.

---

[63] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[64] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003).

[65] *Id. See also VLIW Tech.*, 840 A.2d at 615 (holding that where the contract provisions at issue, either separately or when read together, are subject to more than one reasonable interpretation, for purposes of deciding a motion to dismiss, the meaning of the provisions must be interpreted in the light most favorable to the non-moving party).

**1. The Dolan Family Have Adequately Pled They Are Third-Party Beneficiaries; McVey and Campbell Have Not**

As a threshold matter, the parties dispute Plaintiffs' standing to bring contractual claims as third-party beneficiaries to the Merger Agreement. Since Plaintiffs were not parties to the Merger Agreement,[66] they must demonstrate they have standing to enforce the contract as third-party beneficiaries.[67] To do so at this stage, Plaintiffs must plead facts that allow a reasonable inference that:

> (i) the contracting parties [] intended that the third party beneficiary benefit from the contract, (ii) the benefit [was] intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party [was] a material part of the parties' purpose in entering into the contract.[68]

---

[66] SAC ¶¶ 31, 52, Ex. A (The title of the Agreement is "Agreement and Plan of Merger Among Cablevision Systems Corporation, Altice N.V. and Neptune Merger Sub Corp" and it was signed by these entities.), Ex. C at 15 (Cablevision's Information Statement defines "the parties to the merger agreement" as Cablevision, Altice, and Merger Sub.). *See Orban v. Field*, 1993 WL 547187, at \*9 (Del. Ch. Dec. 30, 1993) (finding that "[o]bviously the shareholders are not parties to [the merger agreement]," despite the agreement being conditioned on the approval of 90% of shares). I reject Plaintiffs' argument that, as former stockholders who received consideration, and as the controlling stockholders who participated in the negotiations and voted their shares to approve the Merger, they should be deemed *de jure* parties to the Merger Agreement. *See Orban*, 1993 WL 547187, at \*9; *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091–92 (9th Cir. 2003) (applying well settled Delaware law in finding stockholders are not parties to merger agreements).

[67] *Insituform of N. Am., Inc. v. Chandler*, 534 A.2d 257, 268 (Del. Ch. 1987) ("Analysis of the standing issue begins with recognition of the general rule that strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party.").

[68] *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at \*5 (Del. Ch. Apr. 17, 2001).

For the first element, Plaintiffs have adequately pled the parties intended that Plaintiffs benefit from Section 6.4(f) of the Merger Agreement. As for the Dolan family, they allege they would not have agreed to include News12 in the transaction if Altice had not agreed to operate the stations in accordance with the News12 business plan, as promised in Section 6.4(f).[69] As for McVey and Campbell, they allege the News12 business plan contains expenditures for newsgathering and production—the bulk of which goes to employee salaries.[70] The News12 business plan protects these salaries with particular line items by department and an incorporated estimate of $60 million in losses over five years.[71]

The Dolan family also adequately allege that Section 6.4(f) was intended to meet a preexisting commitment made to them and that Altice intended "to give the[m] (as beneficiar[ies]) the benefit of the promised performance."[72] Here again, the Dolan family alleges they agreed to sell News12 only because Altice made the commitment that it would operate News12 within clearly expressed parameters.

---

[69] SAC ¶¶ 4, 30.

[70] *Id.* Ex. B.

[71] *Id.*

[72] RESTATEMENT (SECOND) CONTRACTS § 302 (1981). *See Madison Realty*, 2001 WL 406268, at *5; *Insituform of N. Am.*, 534 A.2d at 268. In this regard, the Restatement clarifies that performance need not be "rendered directly to" the third-party beneficiary. RESTATEMENT (SECOND) CONTRACTS § 302 cmt c.

They then agreed by Written Consent to vote their Class B shares "in favor of adoption of the Merger Agreement" in reliance upon that commitment.[73]

McVey and Campbell part ways with the Dolan family in the third-party beneficiary analysis on this second element. The Complaint contains no well-pled facts that Altice made any commitment or owed any "pre-existing obligation" to either McVey or Campbell prior to the Merger Agreement from which they could claim third-party beneficiary status with respect to Section 6.4(f). This would explain why Section 6.8(e) of the Merger Agreement makes clear that Altice is not "prevent[ed] . . . from terminating the employment of any Continuing Employee (by definition including McVey and Campbell)."[74] While the Dolan family may be able to advance an argument that the termination of McVey and Campbell's employment with News12 would constitute a breach of Section 6.4(f) as to them, McVey and Campbell have no standing to assert that claim of breach either as parties to, or third-party beneficiaries of, the Merger Agreement.

Lastly, it is alleged that Section 6.4(f) was included in the Merger Agreement to induce the Dolan family to sell their Cablevision stock, merge Cablevision and News12 into Altice and sign the Written Consent in favor of the Merger

---

[73] *See* SAC ¶ 30, Ex. C at 16, 19, 20, 71.

[74] SAC Ex. A § 6.8(e).

Agreement.[75] Under the circumstances, it is reasonably conceivable that "the intent to benefit the third party [was] a material part of the parties' purpose in entering into the contract."[76]

The Dolan family has well pled each of the three requisite elements to establish third-party beneficiary status. But, of course, the inquiry cannot end there. Section 9.8 of the Merger Agreement states, in part, that the parties "agree that their respective representations, warranties and covenants set forth in this Agreement are solely for the benefit of the other party hereto, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person other than the parties hereto any rights or remedies hereunder."[77] While Section 9.8 is not absolute, it clearly does not identify the Dolan family as third-party beneficiaries. Recognizing this, the Dolan family invoke the canon that a specific provision of a contract trumps a general one in order to argue that Section 6.4(f) trumps Section 9.8.[78] That canon does not fit here, however, because both sections are specific. Section 6.4(f) is specific in providing detailed rights that expressly benefit non-parties to the contract; Section 9.8 is specific in identifying

[75] SAC ¶¶ 4, 10, 56, 74, 81, 84, 87.

[76] *Madison Realty P'rs 7, LLC*, 2001 WL 406268, at *5.

[77] SAC Ex. A § 9.8.

[78] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

20

who is and who is not intended to be a third-party beneficiary of the contract. Canons of contract construction, alone, cannot render unambiguous two specific and yet conflicting contractual provisions.

The goal of contract construction in instances like this is to "harmonize" related contractual provisions.[79] That simply cannot be done here by looking only within the four corners of the Merger Agreement. Extrinsic evidence will be needed to determine what Section 6.4(f) was intended to mean and how, if at all, it is to be enforced.

### 2. Plaintiffs Adequately Allege Section 6.4(f) Survived the Closing of the Merger

For the Dolan family's claims under the Merger Agreement to survive Defendants' motion, it must be reasonably conceivable that Section 6.4(f) survived the Closing. Specifically, it must be reasonably conceivable that Section 9.1, the survival provision, did not apply to Section 6.4(f). Defendants assert that, even if the Dolan family has standing, Section 6.4(f) did not survive Closing because it was not one of the sections designated for survival in Section 9.1.

The parties offer conflicting interpretations of Section 6.4(f). The Dolan family reads Section 6.4(f) as clearly surviving Closing—why else would such a

---

[79] *See Hampton v. Turner*, 2015 WL 1947067, at *3 (Del. Ch. Apr. 29, 2015) (noting that in construing contracts this court is obliged to attempt to "reconcile or harmonize all of the contract's provisions").

detailed, heavily negotiated provision with an accompanying schedule and five-year life span be included in the Merger Agreement?[80]   Defendants counter that Section 6.4(f) was simply a goodwill gesture and was in no way meant to bind Altice before or after the Merger closed.[81]   In reply, the Dolan family point out that Section 6.4(f) is not drafted as an expression of good will.  Instead, it is drafted to state an obligation—"Parent *will operate* News12 in accordance with the existing News12 business plan . . . ."[82]

For Defendants to prevail on their motion to dismiss, theirs must be the only reasonable constructions of Section 6.4(f) and Section 9.1 as a matter of law.[83]  That definitive construction is not possible here.  Defendants' construction fairly tracks the plain language of Section 9.1, but their construction of the interaction between

---

[80] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("PAB") at 14–20.  In this regard, Plaintiffs cite *Sunline*, where a contract contained conflicting terms that could not be definitively married, prompting the Supreme Court to hold that the contract was ambiguous and that a trial would be needed to sort through conflicting parol evidence.  *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 851–52 (Del. 2019).

[81] Tr. 9:21–11:21.  To support this argument, Defendants point to Section 6.8(a) of the Agreement as another place in the Agreement where a forward-looking covenant is not enforceable post-Closing. Tr. 9:8–21.  "Section 6.8(a) states that compensation and certain benefits for continuing employees will not be reduced in the first year after closing.  But Sections 6.8(e) and 9.8 make plain that employees are not third-party beneficiaries with standing to enforce the promises of Section 6.8(a)."  Defs.' Reply Br. in Further Support of their Mot. to Dismiss at 4.

[82] SAC Ex. A § 6.4(f)(i) (emphasis supplied).

[83] *VLIW Tech.*, 840 A.2d at 615.

Section 9.1 and Section 6.4(f) renders Section 6.4(f) superfluous in the sense that it is entirely unenforceable—by anyone.[84] That result is inconsistent with the contractual cannon that discourages the court from construing a contract in a way that results in "mere surplusage."[85] It also creates an arguably "absurd result" by rendering meaningless the protections the Dolan family allege they bargained for with respect to News12.[86]

******

The Merger Agreement is ambiguous with respect to whether Section 6.4(f) is: (a) enforceable by the Dolan family as third-party beneficiaries, and (b) enforceable as a covenant that survived the Closing of the Merger. Accordingly, the motion to dismiss Counts I and VI must be denied as to the Dolan family.

---

[84] Tr. 10:22–11:1 (Mr. Cohen: As to 6.4(f), it is an obligation that we took on which is not enforceable. The Court: By anybody. Mr. Cohen: By anybody, Your Honor.").

[85] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 203 ("In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); *id.* cmt. b ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.").

[86] *Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation [of a contract is one that] produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

As neither McVey nor Campbell have standing to enforce the Merger Agreement, however, Counts I and VI must be dismissed as to them.

## B. Plaintiffs Have Not Stated A Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs allege that Altice breached the Merger Agreement's implied covenant of good faith and fair dealing by promising pre-Closing to perform obligations to Cablevision and its stockholders while attempting to avoid this obligation after obtaining control of Cablevision, thereby "frustrating the essential purpose of Section 6.4(f)."[87] The implied covenant is a "limited and extraordinary" legal remedy.[88] It adheres only when "the contract is truly silent with respect to the matter at hand, and only when the court finds that the expectations of the parties were so fundamental that it is clear that they did not feel a need to negotiate about them."[89]

---

[87] SAC ¶¶ 70–77.

[88] *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019). Implied covenant claims are "rarely invoked successfully" and are routinely dismissed in these circumstances. *MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *11 (Del. Ch. May 10, 2018) (internal quotations & citation omitted); *see Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015).

[89] *Allied Capital Corp.*, 910 A.2d at 1032–33. *See Oxbow Carbon & Minerals Hldgs., Inc.*, 202 A.3d at 507 ("Even where the contract is silent . . . [a court] 'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'").

Plaintiffs have not adequately identified any "gap" in the Merger Agreement that the Parties failed to anticipate and address. According to Plaintiffs, the alleged "gap" is revealed in the Merger Agreement's failure to identify who has standing to enforce Section 6.4(f) in the event of breach.[90] I reject this argument as a matter of law. Section 9.8 clearly addresses standing under the Merger Agreement. This Court "will not rewrite contractual language covering particular topics [under the guise of the implied covenant] just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process."[91] Thus, Count II must be dismissed because it is duplicative of Plaintiffs' breach of contract claim.[92] If the Dolan family is to have a right to enforce Section 6.4(f), that right will have to flow from parol evidence that allows the Merger Agreement reasonably to be construed to provide for that right.

---

[90] PAB at 41–42.

[91] *Allied Capital Corp.*, 910 A.2d at 1033 (citation omitted).

[92] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *10 (Del. Ch. Dec. 22, 2010) (finding implied covenant claim not available when "the subject at issue is expressly covered by the contract") (internal quotations & citation omitted); *Fortis Advisors*, 2015 WL 401371, at *3 ("Where the contract speaks directly regarding the issue in dispute, existing contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain[.]") (internal quotations & citation omitted); *Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) (dismissing implied covenant claim as "improperly duplicative of [plaintiff's] contract claims"); *Feldman v. Soon-Shiong*, 2018 WL 2124063, at *3 (Del. Ch. May 8, 2018) (dismissing implied covenant claim where claim was premised on alleged violation of express contractual term).

## C. The Dolan Plaintiffs Have Not Stated A Claim For Equitable Fraud Or Negligent Misrepresentation

The claims for equitable fraud and negligent misrepresentation are not well pled both because they are bootstrapped improperly to the breach of contract claim and they rest on a flawed premise—that there was some sort of legally cognizable special relationship between Altice and the Dolan family.

Conclusory allegations that a party to a contract did not intend to perform at the time of the contract's making do not state a claim for equitable fraud and negligent misrepresentation. These types of allegations, instead, reflect nothing more than a plaintiff's improper attempt to "bootstrap" breach of contract claims with fraud-based claims.[93]

Moreover, the Dolan family's equitable fraud/negligent misrepresentation claims fail as a matter of law because, in the context of a commercial arm's-length transaction, there is no "special relationship" between Altice and the Dolan family as required by Delaware law.[94] "[A] plaintiff claiming equitable fraud must

---

[93] *See BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *8 (Del. Ch. Aug. 3, 2004) ("One cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations.") (internal quotations & citation omitted); *Zutrau v. Jansing*, 2014 WL 3772859, at *14–15 (Del. Ch. July 31, 2014), *aff'd*, 123 A.3d 938 (Del. 2015) (TABLE) (same); *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *5–6 (Del. Ch. Dec. 21, 1998) (same).

[94] A claim for "negligent misrepresentation is often referred to interchangeably as equitable fraud." *See Fortis Advisors*, 2015 WL 401371, at *9 (collecting cases).

sufficiently plead a special relationship between the parties or other special equities, such as some form of fiduciary relationship or other similar circumstances."[95] Cablevision and the Dolan family are sophisticated parties represented by sophisticated counsel.[96] They bargained with Altice at arm's-length. There is no special relationship here.[97] Therefore, Counts III and V must be dismissed.

## D. The Dolan Plaintiffs Have Stated A Claim For Promissory Estoppel

The Dolan family allege that Altice promised to operate News12 in accordance with the News12 Business Plan and, in doing so, induced Cablevision to include News12 in the Merger.[98] Under the so-called *"Lord* test," promissory estoppel requires clear and convincing evidence that: "(1) a promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promise; (3) the promisee reasonably relied on the promise and took

---

[95] *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at \*18 (Del. Ch. Mar. 28, 2018) (internal quotation marks & citation omitted) (dismissing equitable fraud and negligent misrepresentation claims where the agreement was "negotiated at arms' length" and was "carefully drafted" by "two of the largest demolition companies in the United States" who were "represented by competent counsel") (internal quotations & citation omitted).

[96] SAC Ex. C at 19.

[97] Sophisticated entities represented by sophisticated counsel engaged in arm's-length negotiations "generally do not qualify for the kind of equitable protection that the negligent misrepresentation doctrine envisions." *LVI Gp. Invs.*, 2018 WL 1559936, at \*18 (alteration in original).

[98] SAC ¶¶ 80–85.

action to his detriment; and (4) such promise is binding because injustice can be avoided only by enforcement of the promise."[99]

Typically, "[p]romissory estoppel does not apply . . . where a fully integrated, enforceable contract governs the promise at issue;" rather, the Court "must look to the contract as the source of a remedy[.]"[100] But where a defendant denies that she is contractually bound to the plaintiff, or asserts that the contract is unenforceable, the plaintiff may plead promissory estoppel as an alternative to breach of contract.[101] Here, if the Merger Agreement does not bind Altice to the Dolan family, then the Dolan family have adequately pled: (1) a definitive extra-contractual promise (to run News12 in accordance with its business plan); (2) intended to induce action (the sale of News12 and support for the Merger Agreement); (3) reasonable and detrimental reliance (the agreement to sell News12 and support the Merger Agreement); and (4) that injustice will result (the gross deviation from the News12 business plan) if the promise is not enforced. "Determining whether the elements for promissory

---

[99] *Chrysler Corp. v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1032 (Del. 2003) (citing *Lord v. Souder*, 748 A.2d 393, 399 (Del. 1999)).

[100] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013) (reversing denial of summary judgment and dismissing promissory estoppel claim); *see also TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, 2015 WL 5968726, at *5, *10 (Del. Super. Ct. Sept. 25, 2015) (dismissing promissory estoppel claim and noting "the Court is not the forum to rewrite the contract or to add provisions that, in hindsight, a party wishes it had included").

[101] *See James v. United Medical Care, LLC*, 2017 WL 1224513, at *7–8 (Del. Super. Ct. Mar. 31, 2017)

estoppel are met will require a fact intensive inquiry into the details of the parties' dealings."[102]  Defendants' motion to dismiss Count IV as to the Dolan family is denied.[103]

## III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss must be DENIED with respect to Counts I, IV and VI as to the Dolan family, and GRANTED with respect to Counts I, IV and VI as to McVey and Campbell and Counts II, III and V as to all Plaintiffs.  Counsel shall contact chambers to arrange for a scheduling conference with the Court.

**IT IS SO ORDERED.**

---

[102] *Addy v. Piedmonte*, 2009 WL 707641, at *22–23 (Del. Ch. Mar. 18, 2009).

[103] Since McVey and Campbell were not parties to the Merger negotiations and, therefore, received no promises from Altice with respect to News12, they have no claim for promissory estoppel and Count IV, as to them, must be dismissed.