IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GOLDEN RULE FINANCIAL CORPORATION, | § § § | No. 61, 2021 |
| Plaintiff Below, Appellant, | § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § § | C.A. No. 2020-0378-PAF |
| SHAREHOLDER REPRESENTATIVE SERVICES LLC, | § § § § | |
| Defendant Below, Appellee. | § § § | |

Submitted: September 22, 2021
Decided: December 3, 2021

Before **SEITZ**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

**O R D E R**

This 3rd day of December 2021, upon consideration of the parties' briefs and the record of the case, it appears that:

1. The plaintiff-appellant, Golden Rule Financial Corporation ("Golden Rule"), appeals from a Court of Chancery judgment dismissing its complaint pursuant to Chancery Rule 12(b)(6). Golden Rule is the buyer in an agreement ("the Agreement") for the sale of USHEALTH Group, Inc. ("the Company"). The defendant-appellee, Shareholder Representative Services LLC ("SRS"), is the representative of the former stockholders of the Company for purposes of this

transaction. The Agreement provides that Golden Rule would acquire the Company for a base purchase price of $750 million. The base purchase price, however, was subject to a post-closing purchase price adjustment.

2. The post-closing purchase price adjustment process resulted in a dispute between the parties as to the final purchase price, and SRS initiated a dispute resolution procedure contained in the Agreement. When disputes arose during that process, Golden Rule initiated this proceeding. On appeal, Golden Rule claims that the Court of Chancery erred by dismissing its complaint. We have concluded that the Court of Chancery did not err and that its judgment should be affirmed.

3. Golden Rule is a health insurance company organized under the laws of Delaware. The Company is a Delaware corporation that owns several insurance companies and other entities. The Seller, SRS, is a Colorado-based LLC and is the representative agent and attorney-in-fact of the stockholders of the Company for purposes of the Agreement.

4. On June 2, 2019, Golden Rule and SRS entered into the Agreement whereby Golden Rule would acquire the Company. The parties closed the transaction on August 31, 2019. The Agreement includes a price adjustment mechanism based on whether certain accounting metrics at closing exceeded or fell short of targets established at signing. The purchase price was to be adjusted either upward or downward, depending on whether any business changes increased or

2

decreased the value of the Company between signing and closing. Such a price adjustment provision is common in transactions of this type and is referred to as a "true-up process."

5. The specific accounting metric that was to be utilized in the true-up process is "Tangible Net Worth."[1] The Agreement provides that Tangible Net Worth means "as of the [closing date], the total assets . . . minus the total Liabilities . . . minus the total intangible assets . . . in each case determined *in accordance with the Accounting Principles*."[2] The Agreement sets the target Tangible Net Worth at $52 million. If the Tangible Net Worth at closing exceeded $52 million under the true-up process, Golden Rule would owe the excess amount. If the Tangible Net Worth fell short of the $52 million target, the purchase price would be reduced accordingly.

6. The Agreement includes a several-step process to accurately determine the purchase price adjustment at closing. First, § 3.1(a) provides that no later than five days before closing, SRS was required to provide Golden Rule with Pre-Closing Financials, which included good-faith estimates of the financial metrics relevant to the true-up process and the Company's estimated purchase price at closing. The applicable provision reads, in relevant part, as follows:

> No later than five (5) Business Days prior to the anticipated Closing Date, the Company shall deliver to [Golden Rule] a statement setting forth an estimated

---

[1] App. to Appellant's Op. Br. at A0025 (Compl. ¶ 25) [hereinafter A_].
[2] A0064 (emphasis added).

3

balance sheet of the Company as of the [closing date] prepared in accordance with the Accounting Principles (the "Estimated Balance Sheet") and a schedule . . . (the "Estimated Schedule") showing, in reasonable detail, a good faith estimate of the Company's calculations of the Tangible Net Worth (the "Estimated Tangible Net Worth") . . . .[3]

Thus, the Agreement required that estimates be prepared in accordance with the "Accounting Principles,"[4] which are defined in Annex A of the Agreement. The Agreement further provided at § 3.4(b) that Golden Rule was to respond to SRS's calculations within ninety days after the closing date with its own calculation of Tangible Net Worth. Sec 3.4(b) provides in relevant part, as follows:

No later than 90 days after the Closing Date, [Golden Rule] shall deliver to [SRS] a statement (the "Final Adjustment Statement") setting forth (i) the balance sheet of the Company as of the [closing date] prepared in accordance with the Accounting Principles, consistently applied (the "Subject Balance Sheet"), and (ii) [Golden Rule's] good faith calculation of (A) the Tangible Net Worth. . . .[5]

7. Essential to SRS's and Golden Rule's calculations of the Tangible Net Worth are the Accounting Principles. The Accounting Principles first require that the Tangible Net Worth be prepared and calculated in accordance with the following hierarchy:

---

[3] A0073.
[4] A0145.
[5] A0077.

4

(a) The accounting principles and policies specifically set out below (the "Specific Policies");

(b) To the extent not addressed in paragraph (a) and not inconsistent with GAAP, as applicable, the accounting policies, principles, procedures, rules, practices, methodologies, categorizations, and definitions used to prepare the audited GAAP annual consolidated balance sheet as at December 31, 2018 . . .;

(c) To the extent not addressed in paragraphs (a) and (b), GAAP, as applicable.[6]

8. Therefore, the parties were required to begin their calculations in accordance with the "Specific Policies."[7] The Specific Policies refer to a special accounting standard known as "ASC 606." ASC 606 is the accounting procedure at issue in this case. ASC 606 was adopted by the Financial Accounting Standards Board ("FASB")—an organization that establishes financial accounting standards for companies that follow the Generally Accepted Accounting Principles ("GAAP"). ASC 606 is a relatively new accounting standard. Private companies, such as the Company, were not required to adopt it until the annual reporting period ending December 31, 2019. Consequently, it was not mandatory for the Company to implement ASC 606 during negotiations or prior to closing. The parties, through their negotiations, however, chose to include ASC 606 in the Accounting Principles.

9. Prior to closing, SRS provided Golden Rule with its Estimated Tangible

---

[6] A0145.

[7] *Id.*

5

Net Worth. SRS estimated the Tangible Net Worth at closing to be approximately $40.75 million, which would reduce Golden Rule's purchase price by $11.25 million. When Golden Rule began to calculate its final adjustment after closing, it realized that the Company had consistently but incorrectly applied ASC 606. Applying the incorrect approach used by the Company prior to closing, Golden Rule calculated the final Tangible Net Worth to be approximately $35 million, $5.75 million below SRS's estimations. However, when Golden Rule applied ASC 606 *correctly*, the final Tangible Net Worth increased to $73.7 million.

10. Believing that the parties had agreed to "consistently apply" the Accounting Principles post-closing in the same manner as they had been applied when determining the Tangible Net Worth target set forth in the agreement and SRS's calculation just prior to settlement, Golden Rule's Final Adjustment Statement relied on the incorrect, yet consistent, ASC 606 approach taken by the Company and SRS. Under this approach, Golden Rule determined Tangible Net Worth at the aforementioned $35 million. Golden Rule, however, also provided the Company and SRS with a Reconciliation Statement that showed the estimate of $73.7 million had the ASC 606 been applied correctly rather than "consistently."

11. SRS took the position that ASC 606 should be correctly applied, and that the Final Adjustment Amount should be based on the Tangible Net Worth of $73.7 million calculated by Golden Rule. It began the Agreement's dispute resolution

6

process and in that proceeding engaged an independent accounting firm known as KPMG to determine the Final Adjustment Amount and resolve the dispute over the application of ASC 606.

12. Golden Rule then filed its complaint in the Court of Chancery. It set forth three counts: breach of contract, breach of the implied covenant of good faith and fair dealing, and quasi-estoppel. The relief requested in all three was a declaration that the Agreement requires the same, consistent application of ASC 606 as had been applied by the Company and SRS, and an injunction prohibiting SRS from asking KPMG to determine the Financial Application Amount using an application of ASC 606 that is inconsistent with the Company's own application. SRS responded with its motion to dismiss the complaint for failure to state a claim upon which relief could be granted under Rule 12(b)(6).

13. In its ruling on SRS's motion to dismiss, the court first found, as to Count I, the breach of contract claim, that the agreement unambiguously requires the *correct* application of ASC 606 to the Closing Balances Sheets and the Tangible Net Worth estimates. It reasoned that although the Agreement does not use the qualifiers "accurate" or "correct," they are inherent in the ordinary and usual meaning of the provisions involved. The court rejected Golden Rule's argument that "consistently applied" in § 3.4(b)(i) required that the Company's incorrect application of ASC 606 be carried on to the conclusion of the process.

7

14. Regarding Counts II and III, the court found that there was no gap to be filled by the covenant of good faith and fair dealing, and that Golden Rule did not meet the high standard required for invoking quasi-estoppel.

15. This Court reviews a decision to grant a motion to dismiss under Rule 12(b)(6) *de novo* "to determine whether the trial judge erred as a matter of law in formulating or applying legal precepts."[8] The Court must accept all well-pleaded allegations as true and draw reasonable inferences in favor of the plaintiff.[9] "Nevertheless, conclusory allegations need not be treated as true, nor should inferences be drawn unless they truly are reasonable."[10] "Dismissal is appropriate only if it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff would not be entitled to relief."[11]

16. Golden Rule contends that the contractual language that the final true-up process figures be prepared "in accordance with the Accounting Principles, consistently applied" means that Golden Rule was entitled (and obligated) to prepare the true-up process figures in the same manner the Company did before closing; that the purpose of the true-up process required application of the Accounting Principles in the same manner both before and after closing; and that inconsistent application

---

[8] *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009) (internal quotation marks omitted).

[9] *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008).

[10] *Id.*

[11] *Clinton*, 977 A.2d at 895 (internal quotation marks omitted).

of the Accounting Principles would produce an unfair windfall for SRS. It contends that the Court of Chancery's interpretation of the Agreement causes it to read as if the clause in question, § 3.4(b), said simply "in accordance with the Accounting Principles[,]" and essentially reads the phrase "consistently applied" out of the Agreement.

17. As mentioned, Tangible Net Worth is defined as being prepared "in accordance with the Accounting Principles."[12] The Accounting Principles, in turn, require that the calculations be prepared in agreement with the outlined hierarchy, which unambiguously requires that the Tangible Net Worth "reflect the impact of the requirements of [ASC 606]."[13] Golden Rule contends that it did apply ASC 606 because an incorrect application of the rule is still an application of the rule. We believe, however, that Golden Rule's contentions are antithetical to the plain language that the Tangible Net Worth "reflect the impact of the requirements of [ASC 606]."[14]

18. The structure of the Agreement illustrates that the intention of the parties was to implement the correct approach to ASC 606. The "Specific Policies," which include ASC 606, are at the top of the Accounting Principles hierarchy, followed by "the accounting policies [and] principles . . . used to prepare the [Company's]

---

[12] A0073.
[13] A0145.
[14] *Id.*

audited GAAP annual consolidated balance sheet as at December 31, 2018."[15]  This hierarchy shows that the parties prioritized the application of ASC 606.  An incorrect application of ASC 606 would effectively result in ASC 606 being left unapplied, despite the parties' express agreement to apply ASC 606.

19. Golden Rule's argument that the Court of Chancery's interpretation effectively erases "consistently applied" from the Agreement, violating the principle that courts give effect to all provisions in a contract, is unpersuasive.  Because GAAP "allows for a variety of treatments,"[16] "consistently applied" can reasonably be interpreted as preventing either party from opportunistically picking and choosing different treatments under GAAP rather than applying the agreed upon GAAP provisions.  The plain language of the Agreement supports an application of the correct application of ASC 606.  Golden Rule's position would, in substance, read ASC 606 out of the agreement.

20. Golden Rule relies, in part, upon this Court's opinion in *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*.[17]  In that case, Chicago Bridge agreed to sell its subsidiary, Stone, to Westinghouse.[18]  Chicago Bridge and Westinghouse had an "extensive collaboration and complicated commercial

---

[15] *Id*.

[16] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, 166 A.3d 912, 929 (Del. 2017).

[17] 166 A.3d 912 (Del. 2017).

[18] *Id*. at 917.

10

relationship"[19] in the nuclear power plant business. The relationship became contentious, and to resolve their differences, the parties agreed that Chicago Bridge would sell Stone to Westinghouse, which would allow Chicago Bridge to make a "clean break from the spiraling cost of the nuclear projects."[20] Reflecting the fact that a purpose of the transaction was essentially to enable Chicago Bridge to get out of the nuclear power plant business, the contract had several unique provisions.[21] One was that the purchase price of the deal was set at zero.[22] Chicago Bridge agreed to this purchase price because of another uncommon provision: a Liability Bar.[23] The Liability Bar eliminated Chicago Bridge's liability to Westinghouse for any post-closing claims for breaches of representations and warranties.[24]

21. The agreement had a true-up provision, which required that final calculations be "prepared and determined from the books and records of the Company and its Subsidiaries and in accordance with [GAAP] applied on a consistent basis throughout the periods indicated and with the Agreed Principles."[25] Chicago Bridge was likely to receive compensation only if the true-up process led

---

[19] *Id.* at 914.
[20] *Id.* at 915.
[21] *See id.* at 920.
[22] *Id.*
[23] *See id.*
[24] *Id.*
[25] *Id.* at 922.

to that result. The true-up target in that transaction was Net Working Capital.[26]

22. Shortly before closing, Chicago Bridge delivered to Westinghouse its calculation that the Net Working Capital was approximately $428 million above the target.[27] After settlement, Westinghouse informed Chicago Bridge that it calculated the Net Working Capital at over $2 billion below the target and that Chicago Bridge owed it that amount.[28] Westinghouse admitted that almost all of the $2 billion arose from the proposition that Chicago Bridge's historical financial statements were based on an incorrect application of GAAP in Stone's financial statements.[29] Chicago Bridge argued in response that the Westinghouse's claims constituted alleged breaches of the Agreement's representations and warranties, which were barred by the Liability Bar, and that Westinghouse was, in essence, trying to make an end-run around the Liability Bar.[30] This Court agreed with Chicago Bridge that Westinghouse's claim was barred by the Liability Bar and that the true-up process could resolve only changes in Stone's business between signing and closing.[31]

23. This case is different from *Chicago Bridge* in significant respects. In this case, there is no Liability Bar to contend with and the implementation of ASC 606

---

[26] *Id.* at 914.
[27] *Id.* at 923.
[28] *Id.*
[29] *Id.*
[30] *Id.* at 925.
[31] *Id.* at 934.

was a specifically bargained-for term. Because of these and other factual differences between the cases, *Chicago Bridge* has no persuasive precedential value in this case.

24. We also find no error in the Court of Chancery's dismissal of Golden Rule's equitable claims of breach of the covenant of good faith and fair dealing and quasi-estoppel. The implied covenant of good faith and fair dealing is a "limited and extraordinary legal remedy[,]"[32] which applies only "when the contract is truly silent concerning the matter at hand. "[33] No such gap exists here. "Under Delaware law, the doctrine of quasi-estoppel applies 'when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit. To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another.'"[34] "[C]ourts are particularly reluctant to find unconscionability in contracts between sophisticated corporations."[35] We see no error in the Court of Chancery's conclusion that SRS's effort to have ASC 606 applied correctly, which we agree is consistent with the express terms of the contract,

---

[32] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

[33] *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq.*, *LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006)).

[34] *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 872-73 (Del. 2015) (quoting *Bank of N.Y Mellon v. Commerzbank Capital Funding Trust II,* 2011 WL 3360024, at *8 n.21 (Del. Ch. Aug. 4, 2011).

[35] *Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC,* 86 A.3d 1119, 2014 WL 823407, at *9 (Del. 2014).

is not unconscionable.

NOW, THEREFORE, IT IS THE ORDER of the Court that the judgment of the Court of Chancery is AFFIRMED.

BY THE COURT:


/s/  James T. Vaughn, Jr.
Justice

14